Argued December 13, 1921, reversed February 28, rehearing denied April 11, 1922.

## STATE *v.* LAUNDY.

(204 Pac. 958; 206 Pac. 290.)

**Statutes—Constitutional Requirement as to Subject and Title must be Reasonably Construed.**

1. Provision of Article IV, Section 20, Constitution, that every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title, though mandatory, must be reasonably and liberally construed to sustain legislation not within the mischief aimed against, which was the practice of inserting in one bill unrelated provisions and of

concealing from members of the legislature the true nature of the proposed law by giving it a misleading title.

**Statutes—Matters Connected With "Subject" of Act Need not be Expressed in Title.**

2. Within Article IV, Section 20, Constitution, requiring an act to embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title, the word "subject" includes the chief thing to which the statute relates, and the matters properly connected therewith are matters germane to and having a natural connection with the general subject of the act, and it is only the general subject which need be expressed in the title.

**Statutes—Title Giving Reasonable Notice of Contents is Sufficient.**

3. If the subject of an act is so expressed in the title as to give reasonable notice of its contents, it is sufficient.

**Statutes—Title of Syndicalism Act Includes Provisions Against Joining Organizations.**

4. The provisions in Section 3, Syndicalism Act, making it unlawful to become a member of or assemble with an organization teaching the proscribed doctrines, is germane to the subject of the act as expressed in the title to define criminal syndicalism and to prohibit the advocacy, teaching, or affirmative suggestion thereof, though the title does not refer to membership in such organizations, and that provision is not unconstitutional as being broader than the title.

**Constitutional Law—Unconstitutionality of Act must Appear Beyond Reasonable Doubt.**

5. Courts will not pronounce an act unconstitutional unless it appears beyond a reasonable doubt.

**Constitutional Law—Only Question for Courts is Power of Legislature to Enact Statute.**

6. When the constitutionality of a state statute is assailed, the sole inquiry for the courts is whether it exceeds any limitation placed upon the legislature by the Constitution of the state or of the United States.

**Constitutional Law—Legislature can Enact Laws to Promote General Welfare.**

7. The legislature may within constitutional limitations make any law which promotes the order, safety, health, morals and general welfare of society, and it is the exclusive province of the legislature to determine what acts are inimical to public welfare.

**Constitutional Law—Subject to Constitutional Limitations, Legislature Alone Determines What are Crimes.**

8. Subject to constitutional limitations, it is the exclusive province of the legislature to declare that acts inimical to the public welfare shall constitute crimes.

Constitutional Law—Insurrection and Sedition—Syndicalism Act
     Does not Interfere With Personal Liberty.

9. Section 3, Syndicalism Act, prohibiting the joining of or
assembling with an organization which advocates crime or violence
to accomplish industrial or political ends or to effect a revolution
or for profit, does not unlawfully interfere with personal liberty,
since liberty does not imply unrestricted license, and it is within
the power of the legislature to declare that inciting others to
commit acts which are already crimes shall be a crime in itself.

Constitutional Law—Insurrection and Sedition—Syndicalism Act is
     not Class Legislation.

10. Section 3, Syndicalism Act, defining and prohibiting criminal
syndicalism, is not class legislation, since it does not discriminate
against some or favor others, but affects all alike.

Insurrection and Sedition—Syndicalism Act Does not Violate Con-
     stitutional Provisions Concerning Treason—"Criminal Syndi-
     calism."

11. Section 3, Syndicalism Act, defining "criminal syndicalism"
as the advocacy of crime or violence as a means of effecting
industrial or economic change or of effecting a revolution, does
not violate Article I, Section 24, Constitution, or Article III,
Section 3, Constitution of the United States, providing that treason
shall consist only in levying war against the government or ad-
hering to its enemies and giving them aid and comfort, since
those provisions do not prevent the punishment of acts intended
for the subversion of government which have not ripened into
treason.

Constitutional Law—Insurrection and Sedition—Syndicalism Act
     Does not Violate Constitutional Freedom of Speech.

12. Section 3, Syndicalism Act, defining criminal syndicalism
as the advocacy of crime and violence as a means of effecting
industrial or political change or revolution, does not violate Article
I, Section 8, Constitution, protecting the freedom of speech, but
making every person responsible for the abuse of that right, since
freedom of speech does not mean unbridled license.

Constitutional Law—Insurrection and Sedition—Syndicalism Act
     Does not Violate Right to Assemble Peaceably.

13. Section 3, Syndicalism Act, making it a felony to become a
member of an organization advocating syndicalism or to assemble
with such organization, does not violate Article I, Section 26,
Constitution, prohibiting laws restraining the inhabitants from
assembling in a peaceable manner.

Criminal Law—Syndicalism Act is Sufficiently Definite and Certain.

14. Section 3, Syndicalism Act, making it unlawful to organize,
become a member of or meet with an organization which advocates
criminal syndicalism as defined in Section 1 of the act, or the neces-

---

9. On validity of legislation directed against social or in-
dustrial propaganda deemed to be of dangerous tendency, see note
in 1 A. L. R. 336.

sity of doing any act of physical violence or the commission of any crime or unlawful act as a means of accomplishing or effecting any industrial or political ends, change or revolution, or for profit, is sufficiently definite and certain to sustain a conviction for its violation.

#### Insurrection and Sedition—Indictment Charging Syndicalism by Becoming Member of Organization Held Sufficient.

15. An indictment which charged, in the language of the statute against criminal syndicalism, that defendant organized, became a member of, and attended a meeting of the Industrial Workers of the World, which was an organization advocating criminal syndicalism and advocating crime and violence as a means for effecting industrial or political ends or revolution, complies with Article I, Section 11, Constitution, giving accused the right to demand the nature and cause of the accusation against him, and with Sections 1437, 1440, 1448, Or. L., prescribing the requisites of an indictment.

#### Indictment and Information—Several Counts cannot be Joined in One Indictment.

16. Under Section 1442, Or. L., providing that the indictment must charge but one crime, it is not permissible to join two or more counts in a single indictment, and, if an indictment charges two or more distinct and substantive offenses, it is bad for duplicity.

#### Indictment and Information—Acts Entering into Continuous Transaction may be Charged Together.

17. Acts which form the component parts of a single transaction and constitute but a single offense ordinarily can be charged together in the indictment.

#### Indictment and Information—Several Means of Committing Offense may be Charged Together if not Repugnant.

18. Where a single offense may be committed by several means, it may be charged in a single count to have been so committed if the ways and means are not repugnant, and, under Section 1442, Or. L., an indictment for a crime which may be committed by the use of different means may allege the means in the alternative.

#### Indictment and Information—Statutory Offense may be Charged to have Been Committed in All Ways in Statute Unless Repugnant.

19. When a statutory offense may be committed in one or more of several ways specified by the statute, the indictment may, in a single count, charge the commission of the offense in any or all of the ways specified, and may charge them conjunctively, though the statute mentions them disjunctively, unless repugnancy results from charging the acts conjunctively or the acts are distinct and are performed at different times and do not constitute component parts of one transaction.

#### Indictment and Information — Indictment Charging Syndicalism by Organizing, Joining and Meeting With Society is not Duplicitous.

20. Since the acts of organizing, becoming a member of and meeting with an organization advocating the doctrine of criminal

syndicalism, made a felony by Section 3, Syndicalism Act, may all be parts of one transaction and are not repugnant, an indictment charging that defendant at the specified time and place committed all of those acts is not subject to demurrer on the ground of duplicity.

#### Criminal Law—Election not Required Before Evidence if Indictment is not Duplicitous.

21. Where the indictment charged that the acts of accused in organizing, joining and attending meetings of an organization advocating criminal syndicalism were committed at the same time and place so as not to be duplicitous, the state could not be required to elect before the introduction of any evidence, as to which of those acts it would rely upon for conviction.

#### Criminal Law—Motion to Require Election at Close of State's Evidence Requires Consideration of Evidence.

22. A motion by defendant at the close of the state's evidence in chief to require the state to elect the act upon which it would rely for conviction requires the indictment, charging several acts at the same time and place as constituting the offense, to be considered in connection with the evidence in determining whether the acts are part of one transaction.

#### Insurrection and Sedition—Act Making It Felony to "Become" a Member is not Violated by Being a Member.

23. Section 3, Syndicalism Act, making it a felony to become a member of an organization advocating criminal syndicalism, but expressly making it an offense to be a member of such organization, as was done by Laws of 1921, Chapter 34, does not make it a felony for defendant to be a member of such organization where he had joined before the act was passed, since to "become" means to pass from one state to another, to enter into some state or condition.

#### Criminal Law—State must Elect Between Offense of Joining Organization and Assembling With it Seven Months Later.

24. In a prosecution for criminal syndicalism, where the indictment charged that defendant joined an organization advocating syndicalism and met with such organization at the same time and place, but the evidence showed that defendant joined the organization in May without at that time attending any meeting of it, and that the meeting he attended occurred in November, the acts of joining and attending the meeting were separate transactions, constituting distinct offenses, and it was error to refuse to require the state at the close of its evidence to elect as to which of those acts it would rely upon for conviction.

#### Criminal Law—Continuing Existence of Organization Advocating Syndicalism Between Defendant's Joining and His Assembling With It Does not Render Election Unnecessary.

25. Where the evidence showed that defendant joined an organization advocating syndicalism in May without then attending a meeting, and attended a meeting thereof in November, the fact that the organization had a continuous existence between those two dates does not make the two acts part of the same

transaction so as to relieve the state of the necessity of electing as to the one of them upon which it would rely for conviction.

### Insurrection and Sedition—Literature Distributed by Organization's Agents Elsewhere is Admissible to Show Its Character.

26. In a prosecution for joining an organization advocating criminal syndicalism, samples of literature distributed by officers and agents of the same organization in other cities, and even in other states, are admissible to show the character of the organization.

### Insurrection and Sedition—Literature Distributed Before Syndicalism Act is Admissible to Show Character of Organization.

27. In a prosecution for joining an organization advocating criminal syndicalism contrary to Section 3, Syndicalism Act, literature distributed by the agents and officers of the organization prior to the enactment of that law is admissible to show the character and purpose of the organization.

### Insurrection and Sedition—Organization Need not Teach Prohibited Doctrines Within County to Make Joining It a Crime.

28. To establish the offense of joining an organization teaching criminal syndicalism within the county where the accused joined the organization, it is not necessary to show that the *situs* of the organization was localized within the county, or even that it taught the prohibited doctrines within that county.

### Constitutional Law—First Ten Amendments to Federal Constitution Do not Limit State Action.

29. The first ten amendments to the Constitution of the United States contain no restrictions on the powers of the state, but were intended to operate solely on the federal government.

### Courts—Federal Practice for Protection Against use of Unlawfully Seized Evidence Followed by State.

30. Since Article I, Sections 9 and 12, Constitution, protecting against unlawful searches and seizures and against being compelled in any criminal prosecution to testify against oneself, are in effect the same as Constitution of the United States, Amendments 4 and 5, the practice established by the United States Supreme Court whereby accused, from whom articles were seized after unlawful search, can prevent their being used against him by petition for their return either before or at the trial if he did not know of the unlawful seizure before that, should be adopted and followed by the courts of the state.

### Arrest—Policeman can Arrest Without Warrant Attendants at Meeting of Syndicalist Organization.

31. Under Section 1745, Or. L., making policemen peace officers, Sections 1754 and 1763, authorizing a peace officer to arrest without warrant for a crime committed in his presence and for a felony committed not in his presence by accused or which he has reasonable cause to believe accused committed, and Section 3, Syndicalism Act, making it a felony to assemble with an organization teaching criminal syndicalism, policemen could lawfully arrest the members of such an organization while attending its meeting, and, in making such arrest, could perform any acts they could have done if they had held a warrant.

**Arrest—Person of Prisoner may be Searched.**

32. An officer who makes a lawful arrest may search his prisoner and take and hold articles found upon his person which are connected with his supposed crime as its fruits or as the instruments with which it was committed or which supply proofs relating to the transaction, so that an officer lawfully arresting a person for criminal syndicalism may lawfully take from him and hold his membership book in the syndicalist organization.

**Arrest—Arresting Officer may Lawfully Take Articles Under Control of the Prisoner if They Supply Evidence of Guilt.**

33. An arresting officer may at the time of making the arrest lawfully take into possession articles in the possession of or under the control of the prisoner if they supply evidence of guilt, and may in some circumstances search the room or place where accused is arrested.

**Arrest—Criminal Law—Seizure of Syndicalist Literature in Room Where Accused was Arrested is Lawful, and Evidence Obtained is Admissible.**

34. The officers in making a lawful arrest without warrant of accused for criminal syndicalism may take into their possession at the time of the arrest documents and literature which tend to show the character of the organization, where the place of arrest was not the private residence or place of business of accused, regardless of whether it was a public or *quasi*-public hall, and the papers so seized may be used in evidence against accused.

**Criminal Law—Accused cannot Complain of Admission in Evidence of Another's Property Wrongfully.**

35. Accused cannot complain of the admission in evidence against him of property of another person because such property was seized unlawfully, since the right violated was not the right of accused.

**Criminal Law—Admitting in Evidence Lease Taken from Defendant's Desk Held Harmless.**

36. In a prosecution for criminal syndicalism, where defendant claimed the meeting which he was attending when arrested was not that of the syndicalist organization, but of another organization, the admission in evidence of a lease of the property to the latter organization, if erroneous because of the manner in which the lease was obtained, was not prejudicial to defendant.

**Criminal Law—Legislature may Generally Penalize Act Without Regard to Intent.**

37. The legislature may as a general rule penalize the doing of an act without regard to the intent or knowledge of the doer, though a law which would punish a man for the commission of an act which the utmost care on his part would not enable him to avoid would probably not be valid.

**Criminal Law—Whether Statute Requires Criminal Intent is to be Determined from Language and Circumstances.**

38. The appearance or nonappearance of the word "knowingly" or its equivalent in a statute is not conclusive on the question whether

103 Or.—29

the statute requires criminal intent to establish the offense, but
that question is to be determined by considering the subject matter
of the statute, its language, the evil sought to be eradicated or
prevented, and the consequences of the several constructions to
which the statute may be susceptible, and, if it clearly appears it
was the legislature's intention to make the act a crime regardless
of intent, the courts will give effect to that intention.

### Insurrection and Sedition—Knowledge or Intent Unnecessary to Establish Syndicalism by Joining Organization.

39. To establish the offense of criminal syndicalism under
Section 3, Syndicalism Act, by becoming a member of or assembling
with a syndicalist organization, in which act the words "with the
intent" are found connected with the preceding clause, but not
with the portion of the statute under examination, guilty knowl-
edge or criminal intent is not essential either under the express
or implied requirements of the statute.

### Insurrection and Sedition—Instruction Defining "Voluntary Assembly" Held Sufficient.

40. In a prosecution for criminal syndicalism, an instruction
that to voluntarily assemble with an organization in the meaning
of the statute meant to meet with and take part in the proceedings
of such an assembly with the purpose of aiding and abetting in
carrying out the common design of the meeting was as favorable
to defendant as he was entitled to.

### Insurrection and Sedition—Instruction as to Knowledge of Character of Organization Held Sufficient.

41. In a prosecution for criminal syndicalism, an instruction
that the jury should not convict unless satisfied that at the time
accused became a member of the organization he knew or had
reasonable grounds for believing or had a reasonable opportunity
to learn of the alleged unlawful purposes or character of the
organization gave defendant all he was entitled to, since it
prevented the jury from convicting him of that which he could
not know.

## ON PETITION FOR REHEARING.

### Criminal Law—Exception may be Taken by any Words Which Show Ruling is Objected to—"Exception."

42. Within Section 169, Or. L., defining an exception as "an
objection taken at the trial to a decision upon matter of law," an
exception is a protest and notice of nonacquiescence in the decision
objected to, and may be taken in any form or language to that
effect.

### Criminal Law—Exception may be Presented by Objections to Ruling Without Use of Word "Except."

43. In view of the history of legislation (Sections 172, 208, 556,
1582, 1625, Or. L.), and rule 12 of the Supreme Court (173 Pac. x)
an adverse ruling on a motion to require the state to elect between
separate counts of an indictment charging distinct offenses was
properly excepted to, where the defendant persistently protested
against the ruling, even though an express "exception" was not

taken in one instance when the motion was unnecessarily renewed.

**Criminal Law—Exception to Single Ruling Denying Two Motions Held an Exception as to Each.**

44. Where defendant in his motion for a directed verdict stated, if denied, he would renew his motion to compel plaintiff to elect between separate counts of the indictment charging separate offenses, and on denial excepted and protested, *held* the ruling was a denial of both motions, and defendant's protest was an objection as to each, and constituted an exception to denial of the motion to require election.

From Multnomah: H. H. BELT, Judge.

In Banc.

Joseph Laundy was convicted of criminal syndicalism; and he appealed from the consequent judgment.

The indictment upon which the defendant was tried and convicted, omitting some of the mere formal parts, reads thus:

"The said Joe Laundy on the twelfth day of November A. D. 1919, in the county of Multnomah and state of Oregon, then and there being, did then and there unlawfully and feloniously help to organize, become a member of, and voluntarily assemble with a certain society and assemblage of persons, to wit: The Industrial Workers of the World, which society and assemblage of persons was formed to and did then and there unlawfully and feloniously teach, advocate and affirmatively suggest the doctrine of criminal syndicalism, sabotage and the necessity, propriety, and expediency of doing acts of physical violence and the commission of crime and unlawful acts as a means of accomplishing and effecting industrial ends, political ends, change, and revolution, and for profit."

The indictment was based upon a statute which was enacted in 1919 and became effective on February 3, 1919. Because of the nature of some of the questions presented for decision, we here set down the whole of the statute, except Sections 4 and 5, which are in

nowise material to any question raised by the defendant.

## "AN ACT

"Entitled an act defining criminal syndicalism, and the word 'sabotage'; prohibiting the advocacy, teaching or affirmative suggestion thereof; and prohibiting the advocacy, teaching or affirmative suggestion of crime, physical violence, or the commission of any unlawful act or thing as a means to accomplish industrial or political ends, change or revolution, or for profit; and prohibiting assemblages for the purpose of such advocacy, teachings or suggestions; declaring it unlawful to permit the use of any place, building, rooms or premises for such assemblages in certain cases; and providing penalties for the violation thereof, and declaring an emergency.

"Be It Enacted by the People of the State of Oregon:

"Section 1.   Criminal syndicalism is hereby defined to be the doctrine which advocates crime, physical violence, arson, destruction of property, sabotage, or other unlawful acts or methods, as a means of accomplishing or effecting industrial or political ends, or as a means of effecting industrial or political revolution, or for profit.

"Section 2.   'Sabotage' is hereby defined to be malicious, felonious, intentional or unlawful damage, injury or destruction of real or personal property of any employer or owner, by his or her employee or employees, or any employer or employers or by any person or persons, at their own instance, or at the instance, request or instigation of such employees, employers, or any other person.

"Section 3.   Any person who, by word of mouth or writing, advocates, affirmatively suggests or teaches the duty, necessity, propriety or expediency of crime, criminal syndicalism, or sabotage, or who shall advocate, affirmatively suggest or teach the duty, necessity, propriety or expediency of doing any act of violence, the destruction of or damage to any property, the bodily injury to any person or persons, or the commission of any crime or unlawful act as a means

of accomplishing or effecting any industrial or political ends, change or revolution, or for profit; or who prints, publishes, edits, issues or knowingly circulates, sells, distributes, or publicly displays any books, pamphlets, paper, handbill, poster, document, or written or printed matter in any form whatsoever, containing matter advocating, advising, affirmatively suggesting or teaching crime, criminal syndicalism, sabotage, the doing of any act of physical violence, the destruction of or damage to any property, the injury to any person, or the commission of any crime or unlawful act as a means of accomplishing, effecting or bringing about any industrial or political ends, or change, or as a means of accomplishing, effecting or bringing about any industrial or political revolution, or for profit, or who shall openly, or at all attempt to justify by word of mouth or writing, the commission or the attempt to commit sabotage, any act of physical violence, the destruction of or damage to any property, the injury of any person or the commission of any crime or unlawful act, with the intent to exemplify, spread, or teach, or affirmatively suggest criminal syndicalism, or organizes, *or helps to organize or become a member of, or voluntarily assembles with any society or assemblage of persons which teaches, advocates or affirmatively suggests the doctrine of criminal syndicalism, sabotage, or the necessity, propriety or expediency of doing any act of physical violence or the commission of any crime or unlawful act as a means of accomplishing or effecting any industrial or political ends, change or revolution or for profit,* is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state penitentiary for a term of not less than one year nor more than ten years, or by a fine of not more than $1,000, or by both such imprisonment and fine.'' Chapter 12, Laws 1919, codified in Oregon Laws as Section 2025-1.

We have caused to be italicized all that portion of Section 3 upon which allegations of the indictment

are especially based; and it is appropriate to state also that all italics subsequently appearing are ours.

The defendant assails the statute and claims that it is unconstitutional; he argues that the statute is void because it is indefinite and uncertain; he attacks the indictment and asserts that it is insufficient and fatally defective; he contends that he was tried for two offenses and that his motion to require the state to elect ought to have been sustained; he says that he was injured by the admission of incompetent evidence; and he insists that he was prejudiced by the giving of certain instructions over his objections and by the refusal to give certain instructions requested by him.                                    REVERSED.

For appellant there was a brief over the names of *Mr. George F. Vanderveer* and *Mr. H. M. Esterly,* with an oral argument by *Mr. Vanderveer.*

For respondent there was a brief over the names of *Mr. Walter H. Evans,* District Attorney, *Mr. W. H. Hallam,* Deputy District Attorney, and *Mr. E. F. Bernard,* Deputy District Attorney, with an oral argument by *Mr. Hallam.*

HARRIS, J.—1. It is contended that the title of Chapter 12, Laws 1919, is not broad enough to cover those provisions of the act which prohibit organizing, helping to organize, and becoming a member of a society of the character denounced. This contention of the defendant cannot be sustained. Our Constitution, Article IV, Section 20, commands that:

"Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title."

This provision of the Constitution was designed to do away with certain abuses, among which was the practice of inserting in one bill two or more unrelated provisions so that those favoring one provision could be compelled, in order to secure its adoption, to combine with those favoring another provision, when neither, if standing alone, could succeed on its own merits. Another abuse was the practice of concealing from the members of the legislature the true nature of the proposed law by giving it a false and misleading title, and the prevention of this abuse is another object of the Constitution. Although Article IV, Section 20, is mandatory, yet the Constitution must be reasonably and liberally construed to sustain legislation not within the mischief aimed against.

2. The language of the Constitution is, "which subject shall be expressed in the title," and hence it is the "subject" of the act, and not "matters properly connected therewith" which must be expressed in the title. The subject of the law is the matter to which the measure relates and with which it deals. The term "subject" is to be given a broad and extensive meaning so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. The word "subject" includes the chief thing to which the statute relates, and the words "matters properly connected therewith" include every matter germane to and having a natural connection with the general subject of the act; or as expressed in *State* v. *Shaw*, 22 Or. 289 (29 Pac. 1028):

"If all the provisions of the law relate directly or indirectly to the same subject, are naturally connected, and are not foreign to the subject expressed in the title, they will not be held unconstitutional."

3. The office of the title is to advise the members of the legislature of the subject of the proposed legislation, but the details must be found in the body of the measure. If the subject of the enactment is so expressed in the title as to give reasonable notice of the contents of the law, it is sufficient: *Lovejoy* v. *Portland*, 95 Or. 459, 465 (188 Pac. 207).

4. The chief thing to which the statute relates is the advocacy and teaching and affirmative suggestion of crime, physical violence or the commission of unlawful acts as the means to accomplish industrial or political ends, change or revolution, or for profit; the object of the statute is to prohibit and prevent the advocacy and teaching and affirmative suggestion of such acts: *State* v. *Moilen*, 140 Minn. 112, 114 (167 N. W. 345, 1 A. L. R. 333); *People* v. *Malley* (Cal. App.), 194 Pac. 48, 50. In express terms the title declares that the object of the act is to prohibit ''the advocacy, teaching or affirmative suggestion'' of criminal syndicalism and sabotage as defined in the act. The next clause, or simple sentence, appearing in the title is a repetition of the one preceding it, for it declares in express terms that the object of the act is to prohibit ''the advocacy, teaching or affirmative suggestion of crime, physical violence, or the commission of any unlawful act or thing as a means to accomplish industrial or political ends, change or revolution, or for profit''; and the succeeding clause in express terms asserts that the act prohibits ''assemblages for the purpose of such advocacy, teachings or suggestions.'' To prohibit the organizing of, or the helping to organize or the assembling with a society which teaches the acts constituting criminal syndicalism or sabotage is a means which may tend directly or indirectly to accomplish the object of pre-

venting the advocacy, teaching or affirmative sugges-
tion of criminal syndicalism and sabotage: *Lovejoy* v.
*Portland,* 95 Or. 459, 467 (188 Pac. 207). That por-
tion of the statute which makes it unlawful to help
to organize or to become a member of or voluntarily
to assemble with a denounced society or assemblage
embraces matters which are at least "matters
properly connected" with the subject. That part of
the body of the act now under examination is clearly
not broader than the title of the act.

The defendant vigorously contends that the syndi-
calism statute is unconstitutional because it: (1) Is
an unlawful infringement upon personal liberties; (2)
is class legislation; (3) violates constitutional pro-
visions concerning treason; (4) infringes upon the
right of free speech, and (5) encroaches upon the
right of assemblage.

5. The organic law is, of course, the fundamental
law with which all other laws must conform. How-
ever, the courts will not pronounce an act of the
legislature unconstitutional, unless such unconstitu-
tionality clearly appears beyond a reasonable doubt:
*Miller* v. *Henry,* 62 Or. 4 (124 Pac. 199, 41 L. R. A.
(N. S.) 97).

6. When the constitutionality of a state enactment
is assailed, the only question for the court to decide
is one of power. The sole inquiry is,—Does the
statute exceed any limitation placed upon state legis-
lative authority by the organic law of the state or by
the Constitution of the United States? *State* v.
*Jacobson,* 80 Or. 648, 651 (157 Pac. 1108, L. R. A.
1916E, 1180); *Kornegay* v. *City of Goldsboro,* 180
N. C. 441 (105 S. E. 187); *State* v. *Moilen,* 140 Minn.
112 (167 N. W. 345, 1 A. L. R. 331).

7, 8. The legislature may, within constitutional limitations, make any law which promotes the order, safety, health, morals and general welfare of society: *Union Fishermen's Co-operative Packing Co.* v. *Shoemaker,* 98 Or. 659, 674 (193 Pac. 476, 194 Pac. 854); and, subject to constitutional limitations, it is the exclusive province of the legislature to determine what acts are inimical to the public welfare, and to declare that such acts when done shall constitute crimes: *Mugler* v. *Kansas,* 123 U. S. 623, 661 (31 L. Ed. 205, 8 Sup. Ct. Rep. 273, see, also, Rose's U. S. Notes); *State* v. *Bunting,* 71 Or. 259 (139 Pac. 731, Ann. Cas. 1916C, 1003, L. R. A. 1917C, 1162); *State* v. *Moilen,* 140 Minn. 112 (167 N. W. 345, 1 A. L. R. 331); *People* v. *Malley* (Cal. App.), 194 Pac. 48.

9. The statute is not an unlawful interference with personal liberties. Liberty does not import an absolute right to be free from all restraint. Liberty does not imply unrestricted license. The possession and enjoyment of all rights are subject to such reasonable conditions as the governing authority may deem essential to the safety, peace and welfare of the general public: *Jacobson* v. *Massachusetts,* 197 U. S. 11 (3 Ann. Cas. 765, 49 L. Ed. 643, 25 Sup. Ct. Rep. 358); *Mugler* v. *Kansas,* 123 U. S. 623 (31 L. Ed. 205, 8 Sup. Ct. Rep. 273, see, also, Rose's U. S. Notes). Stated broadly, the syndicalism statute penalizes the advocacy or teaching of crime as a means of effecting industrial or political ends or for profit. The acts which shall not be advocated are acts which when done are of themselves unlawful by force of statutes other than the syndicalism statute. If any one of those unlawful acts should

be actually committed, the person so committing such unlawful act would be guilty of a crime; and surely no competent person would think of attempting to argue that his personal liberties are unconstitutionally curbed by legislation penalizing him for intentionally injuring the person or property of another. Statutes penalizing those who solicit or incite others to commit crimes are not innovations upon the criminal law. Stephen, in his Digest of Criminal Law (ed. 1877), page 33, says:

"Everyone who incites any person to commit any crime commits a misdemeanor whether the crime is or is not committed."

If it is within the power of the legislature to declare that a given act, when done, constitutes a crime, then it is likewise within the power of the legislature to declare that to advocate the doing of such act is a crime; for if public policy requires the punishment of him who does an act, it likewise may require the punishment of him who incites the doing of such act, whether the act is actually done or not: *State* v. *Quinlan,* 86 N. J. L. 120 (91 Atl. 111). At the hearing it was argued, on the authority of *Ex parte Smith,* 135 Mo. 223 (36 S. W. 629, 58 Am. St. Rep. 576, 33 L. R. A. 606), that any person may, if he chooses, rightfully associate with persons having the reputation of being thieves. There is a vast difference, however, between the act of merely associating with persons having the reputation of being thieves, and the act of joining with such persons in either the commission of theft or in the advocacy of the commission of theft: *State* v. *Hennessy,* 114 Wash. 351 (195 Pac. 211).

10. The syndicalism statute is not class legislation. It affects all alike. It does not discriminate against some or favor others: *State* v. *Hennessy,* 114 Wash. 351 (195 Pac. 211); *State* v. *Moilen,* 140 Minn. 112 (167 N. W. 345, 1 A. L. R. 331). See, also, *Barbier* v. *Connolly,* 113 U. S. 27 (28 L. Ed. 923, 5 Sup. Ct. Rep. 357); *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224 (58 L. Ed. 1288, 34 Sup. Ct. Rep. 856).

11. The federal Constitution defines treason thus:

"Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid or comfort." Article III, Section 3.

The state Constitution, Article I, Section 24, provides:

"Treason against the state shall consist only in levying war against it, or adhering to its enemies, giving them aid or comfort."

The defendant argues that the Syndicalism Act, when resolved to its final analysis, declares that the doing of the prohibited act constitutes constructive treason. This argument arises out of the fact that the statute penalizes the advocacy of the commission of unlawful acts "as a means of accomplishing or effecting any industrial or *political ends, change or revolution,* or for profit." A single sentence taken from the opinion delivered by Chief Justice Marshall in *Ex parte Bollman,* 4 Cranch (8 U. S.), 75, 126 (2 L. Ed. 554), completely answers the defendant's contention:

"Crimes so atrocious as those which have for their object the subversion by violence of those laws and those institutions which have been ordained in order to secure the peace and happiness of society, are not to escape punishment, because they have not ripened into treason."

The Supreme Court of Washington in a well-considered opinion reached the same conclusion: *State* v. *Hennessy,* 114 Wash. 351 (195 Pac. 211). In *Frohwerk* v. *United States,* 249 U. S. 204 (63 L. Ed. 561, 39 Sup. Ct. Rep. 249), the plaintiff in error who had been convicted of a violation of the Espionage Act of June 15, 1917, Chapter 30, Section 3, 40 Stat. 217, 219, advanced a suggestion like the one advanced in the instant case, and there Mr. Justice HOLMES speaking for the court summarily disposed of the question by saying:

."These suggestions seem to us to need no more than to be stated."

12. Our state Constitution, Article I, Section 8, protects the freedom of speech, for it reads thus:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The same organic law assures the right of assemblage. Article I, Section 26, provides:

"No law shall be passed restraining any of the inhabitants of the state from assembling together in a peaceable manner to consult for their common good; nor from instructing their representatives; nor from applying to the legislature for redress of grievances."

The same organic law which protects the right of each person to speak freely also makes him responsible for the abuse of that right. The syndicalism statute does not attempt to punish the advocacy of peaceable methods for effecting changes: See *Ex parte Hartman,* 182 Cal. 447 (188 Pac. 548). The same organic law which assures the right of assembling limits that right to assembling "in a peaceable

manner." Freedom of speech does not mean un-
bridled license. No man can enter a crowded theater,
falsely shout fire, and thus cause a panic resulting
in the crushing, maiming and killing of enfeebled
men, helpless women and innocent children, and then
justify his conduct by brazenly proclaiming that he
did no more than to exercise his constitutional right
of free speech. "We venture," as did Mr. Justice
HOLMES in *Frohwerk* v. *United States,* 249 U. S. 204,
206 (63 L. Ed. 561, 39 Sup. Ct. Rep. 249),

"to believe that neither Hamilton nor Madison, nor
any other competent person then or later, ever sup-
posed that to make criminal the counselling of a mur-
der" or arson or other unlawful act "would be an
unconstitutional interference with free speech."

We likewise venture to believe that neither Mathew
P. Deady nor George H. Williams, nor any of the
other fifty-eight members of the convention which
framed our Constitution, ever supposed that a statute
prohibiting assemblages from counseling the com-
mission of a crime would be an unconstitutional inter-
ference with the right of assemblage.

13. The Syndicalism Act does not violate the con-
stitutional right to speak freely nor the constitutional
right to assemble peaceably: *State* v. *Boyd,* 86
N. J. L. 75 (91 Atl. 586); *Schenck* v. *United States,* 249
U. S. 47 (63 L. Ed. 470, 39 Sup. Ct. Rep. 247);
*Frohwerk* v. *United States,* 249 U. S. 204 (63 L. Ed.
561, 39 Sup. Ct. Rep. 249); *People* v. *Most,* 171 N. Y.
423 (64 N. E. 175, 58 L. R. A. 502); *State* v. *Holm,*
139 Minn. 267 (166 N. W. 181, L. R. A. 1918C, 304);
*State* v. *Hennessy,* 114 Wash. 351 (195 Pac. 211);
*State* v. *Fox,* 71 Wash. 185 (127 Pac. 1111), affirmed
in *Fox* v. *State of Washington,* 236 U. S. 273 (59
L. Ed. 573, 35 Sup. Ct. Rep. 383); *Ex parte Hartman,*

182 Cal. 447 (188 Pac. 548). No constitutional right, federal or state, is violated by the Syndicalism Act: *State* v. *Moilen,* 140 Minn. 112 (167 N. W. 345, 1 A. L. R. 331); *People* v. *Malley* (Cal. App.), 194 Pac. 48; *Ex parte McDermott,* 180 Cal. 783 (183 Pac. 437).

14. The defendant insists that the statute is void because it is too vague, indefinite and uncertain, and that the indictment is likewise bad because of indefiniteness. The state Constitution, Article I, Section 11, prescribes that the accused shall have the right "to demand the nature and cause of the accusation against him." The Code, Section 1437, Or. L., commands that the indictment shall contain—

"a statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

Another section of the Code, Section 1440, Or. L., declares that the indictment must be direct and certain as it regards—

"the crime charged; and, the particular circumstances of the crime charged when they are necessary to constitute a complete crime."

The Code, Section 1448, Or. L., further provides that the indictment is sufficient if it can be understood therefrom—

"that the act or omission charged as the crime is clearly and distinctly set forth, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended."

The crime of which the defendant is accused is a statutory offense. The statute declares that any person who "helps to organize or become[s] a member of, or voluntarily assembles with any society or assemblage of persons" which teaches the prohibited

doctrines shall be guilty of criminal syndicalism.
The statute specifies the acts of commission which
will effect the crime. The statute informs every
person subject to the jurisdiction of the courts of
this state that he commits the crime of criminal syndi-
calism if he (1) helps to organize; or (2) if he be-
comes a member of; or (3) if he voluntarily assembles
with any society or assemblage of persons which
teaches the inhibited doctrines. The statute describes
the acts which constitute the crime. The indictment
describes the acts with which the defendant is charged
in the same language which is employed in the
statute to define the prohibited acts. The indictment
contains every element of the complete offense as
that offense is defined by the statute. The state
is not required to plead the evidence relied upon
to prove the acts alleged to have been committed
by the defendant. The indictment advises the de-
fendant not only of the nature but also of the cause
of the accusation made against him. The language
employed is such as to enable a person of common
understanding to know what is intended. The statute
defines the kind of societies and assemblages which
no person can organize or help to organize or become
a member of or assemble with. The indictment
describes the Industrial Workers of the World in
the same language which the statute uses to describe
unlawful societies. Words of description used in
the indictment are just as definite and certain as are
the words of description used in the statute; and
assuredly the words of the statute are sufficiently
definite to describe the acts intended to be prohibited
and the kind of societies and assemblages intended
to be banned: *People* v. *Malley* (Cal. App.), 194 Pac.
50; *State* v. *Quinlan,* 86 N. J. L. 120, 123 (91 Atl. 111);

*State* v. *Rose,* 147 La. 243 (84 South. 643, 646) ; *State*
v. *Hennessy,* 114 Wash. 351 (195 Pac. 211, 215) ;
*Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86 (53
L. Ed. 417, 29 Sup. Ct. Rep. 220).

15. The indictment follows the language of the
statute which defines the crime, and consequently the
indictment is sufficiently definite to meet the require-
ments of the Constitution and Code: *State* v. *Shaw,*
22 Or. 287, 290 (29 Pac. 1028) ; *State* v. *Reinhart,* 26
Or. 466, 477 (38 Pac. 822) ; *State* v. *Ross,* 55 Or. 450,
479 (104 Pac. 596, 106 Pac. 1022, 42 L. R. A. (N. S.)
601, 613) ; *State* v. *Townsend,* 60 Or. 223, 231 (118
Pac. 1020) ; *State* v. *Runyon,* 62 Or. 246, 250 (126
Pac. 259) ; *State* v. *Scott,* 63 Or. 444, 446 (128 Pac.
441) ; *State* v. *Brown,* 64 Or. 473, 475 (130 Pac. 985) ;
*State* v. *Mishler,* 81 Or. 548, 549 (160 Pac. 382) ;
*State* v. *Wilbur,* 85 Or. 565, 568 (166 Pac. 51, 167
Pac. 569) ; *State* v. *Frasier,* 94 Or. 90, 100 (180
Pac. 521, 184 Pac. 848) ; 14 R. C. L. 185; *State* v.
*Lowery,* 104 Wash. 523 (177 Pac. 355) ; *People* v.
*Malley* (Cal. App.), 194 Pac. 48; *State* v. *Hennessy,*
114 Wash. 351 (195 Pac. 211) ; *Ex parte McDermott,*
180 Cal. 783 (183 Pac. 437) ; *State* v. *Quinlan,* 86
N. J. L. 120 (91 Atl. 111).

16. The defendant contends that he was tried for
two separate crimes on one indictment. He argues
that the indictment must be held to be duplicitous
whether it is viewed (1) standing alone and by itself,
or (2) in connection with and in the light of the
evidence. The defendant demurred to the indictment
upon the ground, among others, that the charge
embraced more than one crime. It is argued that
the indictment accuses the defendant of the crime of
helping to organize, and of the additional crime of
becoming a member of, and of the further crime of

assembling with an unlawful society and assemblage. The Code, Section 1442, Or. L., provides:

"The indictment must charge but one crime, and in one form only; except that where the crime may be committed by the use of different means the indictment may allege the means in the alternative."

17. In this jurisdiction it is not permissible to join two or more counts in a single indictment. An indictment must in the language of our statute "charge but one crime," and consequently if an indictment charges a defendant with two or more distinct and substantive offenses, it is bad for duplicity. If, however, the facts charged constitute but a single offense, the indictment is not duplicitous, and therefore acts which form component parts of a single transaction may be charged together, and acts entering into a single and continuous transaction ordinarily can be charged together: 22 Cyc. 378. It has been held, for example, that although the deposit of a single letter concerning a lottery in the mails is a distinct offense, the deposit of numerous letters at about the same time and constituting a single transaction, may be charged in one count: *United States* v. *Patty,* 2 Fed. 664, 9 Biss. 429; 22 Cyc. 379.

18. The general rule is that where a single offense may be committed by several means it may be charged in a single count to have been so committed, if the ways or means are not repugnant; and in this state as in other states it is provided by statute that when the crime may be committed by the use of different means the indictment may allege the means in the alternative: Section 1442, Or. L.

19. It is a generally recognized rule of criminal pleading that when an offense against a criminal statute may be committed in one or more of several

ways specified by the statute, the indictment may in a single count charge the commission of the offense in any or all of the ways specified by the statute; and when a statute mentions several acts disjunctively and prescribes that each act shall constitute the same offense and be subject to the same punishment, an indictment may charge any or all of such acts conjunctively, as a single offense. But the rule does not apply when repugnancy results from charging the acts conjunctively; nor does the rule apply where the acts are distinct and are performed at different times and do not constitute component parts of one transaction: 22 Cyc. 380–382; *State* v. *White*, 48 Or. 416, 421 (87 Pac. 137); *State* v. *Dale*, 8 Or. 229, 232; *State* v. *Bergman*, 6 Or. 341, 345; *State* v. *Humphreys*, 43 Or. 44, 47 (70 Pac. 824); *Cranor* v. *Albany*, 43 Or. 144, 147 (71 Pac. 1042); *State* v. *Emmons*, 55 Or. 352, 356 (104 Pac. 882, 106 Pac. 451); *State* v. *Bilyeu*, 64 Or. 177, 180 (129 Pac. 768); *Astoria* v. *Malone*, 87 Or. 88, 95 (169 Pac. 749).

20. When the court ruled upon the demurrer, the evidence had not yet been heard, and consequently the only question which at that stage of the proceeding was presented for decision was whether or not the indictment standing alone and by itself was sufficient as a pleading. The several acts which are charged conjunctively in the indictment are stated disjunctively in the statute. No one of the acts is necessarily repugnant to any of the others. The indictment does not expressly declare, nor does it even intimate that the several acts were done at different times; but, on the contrary, the indictment expressly avers that all of the acts were done at the same time and place. It has sometimes been stated in jurisdictions permitting the joinder of two or

more counts in one indictment that each count must contain an express declaration that the offense charged in such count arose out of the same transaction from which arose the other offenses charged in the other counts. Such statements are inapplicable in this jurisdiction, where the indictment can contain but one count. The indictment filed against Laundy in effect declares that at the same time and at the same place he committed specified acts constituting connected overt acts composing a single transaction: See *State* v. *Dodd,* 84 Wash. 436, 441 (147 Pac. 9). The indictment was framed in strict accordance with the rules which have been established here and are generally recognized elsewhere. The demurrer to the indictment was properly overruled.

21. When the cause came on for trial, and before the selection of a jury, the defendant renewed his contention that the indictment contained more than one charge and moved that the plaintiff be required to elect one of the acts as the one upon which the state intended to reply for conviction. The motion for an order requiring an election at that stage of the trial presented the same question which was submitted to the court upon the demurrer to the indictment. The order denying the motion was warranted for the same reasons that warranted the overruling of the demurrer to the indictment.

22. When the state rested its case in chief the defendant argued that the evidence conclusively showed that the several acts charged in the indictment and relied upon by the state were separate, disconnected and distinct offenses which were not parts of one and the same transaction, and the defendant therefore moved that the state be compelled to designate one of the several offenses as the offense for which

the defendant was to be tried. This second motion for an election made after the state had rested its case in chief presents a question which, because of the evidence is entirely different from the motion which was made before the selection of the jury. When deciding the first motion the court could look to nothing except the indictment; and since the indictment in effect declared that the several acts enumerated in it were committed in one transaction, it was sufficient when tested by demurrer. When deciding the second motion, however, the court was required to read the indictment in the light of the evidence. The trial court ruled that it would not be proper to submit to the jury that phase of the indictment which charged that the defendant did "help to organize," on the theory that there was no evidence tending to show that the defendant helped to organize the Industrial Workers of the World; but the court refused to require the state to make an election of one of the two remaining acts specified in the indictment, and told the jury, when instructing them that if they found that the defendant became "a member of or voluntarily assembled with" the Industrial Workers of the World, they should find him guilty, provided of course such organization was of the kind described by the indictment. In order to determine whether the act of becoming a member and the act of assembling constituted in the attending circumstances two separate offenses it will be necessary to notice the evidence. But before directing attention to the evidence we may with propriety supplement the general rules previously noticed by making reference to individual cases where the rules have been expressed and applied. In *State* v. *Carr,* 6 Or. 134, the defendant was accused of gambling by an indictment in which

it was alleged that he did as proprietor, "deal, play and carry on," a game of faro. It was held that the indictment was not duplicitous, and the court said:

"True, the offense is committed by dealing or playing, but we apprehend that dealing and playing and carrying on a 'game of faro' *all at the same time* and at *one sitting,* and between the *same parties,* would constitute but one offense; and such an indictment may be supported by showing that the defendant has done one of these things."

In *State* v. *McCormack,* 8 Or. 237, a horse, saddle and bridle were taken at the same time and place and from the same person. It was held that *"the whole transaction* constituted but one crime." In *State* v. *Fiester,* 32 Or. 254 (50 Pac. 561), the indictment charged that the defendant murdered his wife,

"by then and there beating her with his fists, and by choking her, and by pushing and dragging her into the water, and holding her under the water, whereby she was drowned."

The court held:

The means being known to the grand jury, it was proper to allege them conjunctively, for it may have been that, in consequence of the alleged beating and choking of the deceased, the defendant was enabled to drag her to and hold her under water until life was extinct; and, if such were the case, and the facts were known to the grand jury, all these acts constituted the means by with the deed was accomplished."

In *Wong Sing* v. *Independence,* 47 Or. 231 (83 Pac. 387), the general rule is recognized and the court stated that if a defendant were charged with the sale of spirituous *and* malt liquors, the charge might be upheld on the theory

"that under a single sale spirituous and malt liquors might have been mixed, so as to constitute but *one violation* of the provisions of the ordinance."

In *State* v. *Clark,* 46 Or. 140 (80 Pac. 101), the indictment alleged that the defendants did

"take, steal and ride away and drive away and lead away one mare and two geldings; said mare and one of said geldings being"

the property of Frank Miller and the other gelding being the property of Harrison. Kelly. The court held that the wording of the indictment was

"equivalent to an allegation that the defendants did at the time and place specified, and *as one transaction, commit the several acts charged.*"

In *State* v. *Belle Springs Creamery Co.,* 83 Kan. 389 (111 Pac. 474, L. R. A. 1915D, 515), the court stated that

"the exposing for sale and selling, as charged, appears to have been *simultaneous, and each as part of one act.*"

In *Herman* v: *People,* 131 Ill. 594 (9 L. R. A. 182), the court said:

"*If two or more offenses form parts of one transaction,* and are of such a nature that a defendant may be guilty of both or all, the prosecution will not, as a general rule, be put to an election. The right of demanding an election, and the limitation of the prosecution to one offense, is confined to charges which are actually distinct from each other, and do not form parts of *one and the same transaction.*"

In *State* v. *Sherman,* 81 Kan. 874 (107 Pac. 33, 135 Am. St. Rep. 403), the information charged that the defendant

"did then and there unlawfully and wrongfully take and receive an order for malt, vinous, spirituous,

fermented and other intoxicating liquors and did then and there contract with G. J. Deines for the sale of malt, vinous, spirituous, fermented, and other intoxicating liquors."

The defendant moved to quash the information on the ground that it was void for duplicity. The appellate court upheld the information and observed that:

"Apparently this was all done at the same time and place and *in the same transaction.*"

The syllabus, which was prepared by the appellate court, reads as follows:

"Where the statute makes either of two or more distinct acts connected with the same general offense, and subject to the same measure and kind of punishment, indictable separately and as distinct crimes, when each shall have been committed by different persons and at different times, they may, when committed by the same person and *at the same time,* be coupled in one count as constituting altogether one offense only. In such cases the offender may be informed against as for one combined act in violation of the statute, and proof of either of the acts mentioned in the statute and set forth in the information will sustain a conviction."

In *Stedman* v. *State,* 80 Fla. 547 (86 South. 428), the indictment alleged that the defendant unlawfully deserted his wife and unlawfully withheld from his wife and his minor child means of support. Referring to the desertion and to the withholding of support, the court said:

"While either the unlawful desertion or the unlawful withholding the means of support by a husband from his wife may be a distinct act from the desertion or withholding of the means of support by a father from his child or children, and each or either of such acts may be indictable and punishable as separate offenses under the statute, yet when such

desertion or withholding of means of support from the wife and child or children is by *the same person at the same time,* such conduct may, under the statute, be regarded as constituting one offense."

In *People* v. *Shotwell,* 27 Cal. 394, the indictment consisted of two counts. By the first count the defendant was accused of having forged and counterfeited a check; and by the second count it was charged that at the same time and place the defendant attempted to pass and did alter and pass as true and genuine a forged check. The defendant contended that the indictment charged the commission of several distinct offenses. The statute upon which the indictment was based declared that the forging or counterfeiting of a check for the payment of money by any person with the intent to damage or defraud any person or persons constituted the crime of forgery, and that the uttering, passing or attempting to pass as true and genuine a forged check constituted the crime of forgery. The criminal practice act provided that an indictment

"shall charge but one offense, but it may set forth that offense in different forms under different counts."

The following excerpt explains the views of the court:

"If it appeared from the indictment that the check described in the second count was the same as that described in the first, the objection that several offenses were charged in the indictment could not be maintained; for if the same person be guilty of making a forged or counterfeit check, and also of attempting to pass it, or of passing it (which involves the attempt), as true or genuine, with the intent to damage or defraud another, he might be indicted and tried for all these connected and consecutive acts

*as constituting one transaction,* or he might be in-
dicted and convicted for each distinct crime of which
he might be proved to be guilty. The doctrine on
this subject is laid down in Wharton's Criminal Law
(141) as follows: 'Where a statute makes two or
more distinct acts, *connected with the same* transac-
tion, indictable, each one of which may be considered,
as representing a stage in the same offense, it has
in many cases been ruled, they may be coupled in
one count. Thus setting up a gaming table, it has
been said, may be an entire offense; keeping a gaming
table and inducing others to bet upon it, may also
constitute a distinct offense; *for either, unconnected
with the other, an indictment will lie. Yet, when
both are perpetrated by the same person, at the same
time, they constitute but one offense,* for which one
count is sufficient, and for which but one penalty can
be inflicted.' "

In *State* v. *House,* 55 Iowa, 466 (8 N. W. 307), the
statute made it a crime by false pretenses to obtain
property or to obtain the signature of another to a
written instrument. The indictment contained two
counts. One count charged that the defendant ob-
tained property by false pretenses, and the other
count accused the defendant of obtaining a signature.
The court held that since both counts had reference to
the same transaction the indictment charged but one
offense, which might properly have been embraced
in a single count. The court pertinently observed
that:

"It will be understood that *if the two counts had
been based upon separate transactions both could not
have been joined in one count, nor in one indictment.*"

In 22 Cyc. 376 the editor says:

"An indictment or information must not in the
same count charge the defendant with the commission
of two or more distinct and substantive offenses, and
in case it does so it is bad for duplicity, if the offenses

are either inherently repugnant, or *so distinct that they cannot be construed as different stages in one transaction.* * * A substantive offense is one which is complete of itself and is not dependent upon another.''

In 1 Bishop's New Criminal Procedure, Section 436, the author states:

''A statute often makes punishable the doing of one thing, or another, or another, sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction, a person who *in one transaction does all,* violates the statute but once, and incurs only one penalty. Yet he violates it equally by doing one of the things. Therefore the indictment on such a statute may allege, in a single count, that the defendant did as many of the forbidden things as the pleader chooses, employing the conjunction *and* where the statute has 'or,' and it will not be double, and it will be established at the trial by proof of any one of them.''

The following are a few of the great number of precedents which are to the same effect as the foregoing: *State* v. *White,* 48 Or. 416 (87 Pac. 137); *State* v. *Waymire,* 52 Or. 281 (97 Pac. 46, 132 Am. St. Rep. 699, 21 L. R. A. (N. S.) 56); *State* v. *Atwood,* 54 Or. 526 (102 Pac. 295, 104 Pac. 195, 21 Ann. Cas. 516); *State* v. *Leonard,* 73 Or. 451 (144 Pac. 113, 144 Pac. 681); *State* v. *Molin,* 99 Wash. 210; *Irvin* v. *State,* 52 Fla. 51 (41 South. 785, 10 Ann. Cas. 1003); *Woodford* v. *People,* 62 N. Y. 117 (20 Am. Rep. 464); *Schulze* v. *State* (Tex. Cr.), 56 S. W. 918; *State* v. *Sutcliffe,* 18 R. I. 53 (25 Atl. 654); *People* v. *Johnson,* 81 Mich. 573 (45 N. E. 1119); *Jones* v. *State,* 17 Ala. App. 283 (84 South. 627); *Goddard* v. *State,* 73 Neb. 739 (103 N. W. 443); *Cook* v. *State,* 16 Lea (Tenn.), 461 (1 S. W. 254); *Raine* v. *State,* 143 Tenn. 168 (226 S. W. 189); *Gantling* v. *State,* 40 Fla. 237 (23 South.

857); *Murray* v. *State,* 25 Fla. 528 (6 South. 498);
*Presley* v. *State,* 61 Fla. 46 (54 South. 367); *People*
v. *Evanoff* (Cal. App.), 187 Pac. 54; *People* v. *Frank,*
28 Cal. 507; *Hayworth* v. *State,* 14 Ind. 590.

23. Turning to Chapter 12, Laws of 1919, it will be
noticed that it is made unlawful to "become a mem-
ber of" any society or assemblage of persons within
the prohibition of the statute, and that the legislature
did not in express terms declare that it was unlawful
to *be* a member of such prohibited society. The trial
court construed the words "become a member of" to
mean "the act of joining, or entering into the status
of membership." This construction was correct:
*State* v. *Berquist,* 109 Kan. 368 (199 Pac. 101).
Lexicographers define the word "become" to mean
"to pass from one state to another; to enter into
some state or condition by a change from another
state, or by assuming or receiving new properties or
qualities, additional matter, or a new connection":
Webster's Dictionary; Century Dictionary. As used
in the indictment, the words "become a member of"
signify that the defendant committed the act of join-
ing the Industrial Workers of the World. The legis-
lative assembly, which convened next after the as-
sembly that passed Chapter 12, Laws of 1919,
re-enacted the criminal syndicalism statute and that
body of lawmakers was careful to make it unlawful to
*be* a member, for the law now reads, "who shall be
or become a member of, or organize or help to organ-
ize": Chapter 34, Laws 1921. In short, Chapter 12,
Laws of 1919, made the act of joining a crime; the
indictment accused the defendant of the act of join-
ing; and he was tried for the act of joining. The
question for decision then is, were the acts of joining
and assembling parts of the same transaction?

The defendant admitted that he joined the Industrial Workers of the World, but he claimed that he joined in 1917, while the state insisted that he joined in April, 1919. If the defendant joined in 1917, he could not be lawfully convicted of joining, because the statute prohibiting the act of joining did not become effective until February 3, 1919. The evidence relied upon by the state to support its theory that the act of joining occurred in April, 1919, consisted of admissions said to have been made by the defendant, and a membership book delivered up by him to the police. On the night of November 11, 1919, a meeting attended by fifty or fifty-five persons was being held in a hall at 128½ Second Street, in Portland. Acting on orders, a number of policemen went to the hall at about 8 P. M. A knock at the door was answered by Laundy, who, when asked, "if it was an I. W. W. meeting," stated that it was not an I. W. W. meeting but was a meeting of the Council of Workers, Soldiers and Sailors. The policemen entered the hall, took Laundy and others to the police station and there interrogated him. Two witnesses testified that Laundy declared, when at the police station, that he had been a member of the I. W. W. for about seven months; and there was also testimony to the effect that on this same occasion at the police station the defendant delivered up a membership book which was received in evidence and shows that Joseph Laundy was "initiated by Clara Ford" on April 26, 1919.

The act of joining the Industrial Workers of the World does not necessarily involve assembling with the society or with an assemblage of persons. A member of the organization may, if a "delegate," alone and by himself initiate another person into

membership. The process of initiation is simple.
The delegate hands the candidate an application
blank. The candidate signs the blank, pays the
prescribed fees, receives an "I. W. W. card" from the
delegate, and thereby becomes a member. The uncon-
tradicted evidence is that if the defendant joined in
April, 1919, he did so by the simple process of being
initiated by Clara Ford alone, and the initiation did
not involve an assembling with an assemblage of
persons.

It is our understanding that the Industrial Work-
ers of the World is an international organization, or
movement, with headquarters at Chicago, and it is
commonly known and designated as "the I. W. W."
It appears that, among other branches, there are two
Portland branches, one of which is known as the
Construction Workers Industrial Union No. 573, and
the other as The Lumber Workers Industrial Union
No. 500. Referring to these two branches, the defend-
ant was asked: "Did you attend some of the meet-
ings of those organizations?" And he answered,
"Yes, sir." However, the record does not disclose
whether the meetings so attended by the defendant
occurred before or after February 3, 1919. The
defendant contended that the meeting which was
broken up by the police on the night of November 11,
1919, at 128½ Second Street was a meeting of the
Council of Workers, Soldiers and Sailors. The state
contended that the meeting was in reality an I. W. W.
meeting. It is not necessary to detail the circum-
stances which, according to the theory of the state,
indicated that the assembly was an I. W. W. meeting.
But it is sufficient to say that there was evidence
which, if believed by the jury, was adequate to sup-
port a finding that it was an I. W. W. meeting.

Although in the printed brief submitted by the state attention is directed to the defendant's admission that he had attended some of the meetings of the two Portland branches, yet the record indicated that at the trial the state relied upon the evidence relating to the meeting of November 11, 1919, to support the charge of assembling. However, if the defendant did attend meetings of the two branches after February 3, 1919, his attendance upon any of those meetings was not, when considered as an inhibited act, any different from the act of assembling on November 11, 1919. In other words, if the act of assembling of November 11, 1919, and the act of joining on April 26, 1919, were not parts of one transaction, neither were any of the acts of attending meetings of either of the two mentioned branches and the act of joining parts of the same transaction; and hence we may with propriety confine our investigation to the act of assembling on November 11, 1919, and the act of joining on April 26, 1919, assuming of course that the defendant joined on that date and not in 1917.

24. The act of joining was in nowise a continuing offense. When the defendant received his membership book the act of joining was completed; the crime was done; the offense was consummated; and the transaction was ended: *State* v. *Quinlan,* 86 N. J. Law, 120, 127 (91 Atl. 111). The statute did not punish the status of being a member; it punished the act of becoming a member, the act of joining: *State* v. *Berquist,* 109 Kan. 368 (199 Pac. 101). The act of assembling on November 11, 1919, was utterly distinct and separate from the act of joining. Neither act had any relation to or connection with the other. The two acts were not two steps taken in the commission of a single offense; they were not connected parts

of a single and continuous transaction. A conviction or an acquittal of the act of assembling would not bar a subsequent trial for the offense of joining on April 26, 1919: *State* v. *Howe,* 27 Or. 138 (44 Pac. 672); *State* v. *Magone,* 33 Or. 570 (56 Pac. 648).

25. But it may be argued that the I. W. W. as an organization continued to exist and that its continued existence spanned the interval between the act of joining and the act of assembling and thus connected the two acts, making them parts of one transaction. The Code bans bawdy-houses and it also provides, by the terms of Section 2081, Or. L., that it is unlawful for a minor to go into a house of prostitution for any purpose whatever. Now, suppose that a minor entered into such a house on April 26, 1919, and that subsequently on November 11, 1919, he went into the same house. Could it be said that the two visits were parts of the same transaction and constituted a single offense, even though it be also assumed that the house had been maintained continuously and without interruption?

Section 2105, Or. L., makes it a crime to deal, play or carry on a game of faro. Suppose that a game of faro is carried on by an owner and employees and that the game runs continuously from April 26th to November 11th with the same dealers, but each dealer taking his turn, and the players changing every few hours. Could it be said that if A played on April 26th and then on November 11th played again, the two acts constituted a single crime? A careful reading of the opinion in *State* v. *Carr,* 6 Or. 134, 135, makes it plain that that precedent is authority for the conclusion that in the case which we have supposed the two acts of playing would constitute two separate offenses and not a single crime. The Code,

Section 2112, Or. L., also declares that it is unlawful for any person to maintain a nickel-in-the-slot machine, and it is likewise unlawful for any person to play or use a nickel-in-the-slot machine. Suppose A maintains such a machine from April 26th to November 11th and suppose B plays the machine on April 26th and again on November 11th. If it be said that one of the purposes of the statute is to prevent the existence and use of nickel-in-the-slot machines, so, too, it can be said that one of the purposes of the criminal syndicalism statute is to prevent the existence of societies of the kind named in the statute. The act of playing the nickel-in-the-slot machine on April 26th and the act of playing on November 11th each contributed towards the maintenance of the machine and tended to defeat the purpose of the statute; and so, too, would the act of joining on April 26th and the act of assembling on November 11th contribute towards the continued existence of the Industrial Workers of the World and tend to defeat the purpose of the statute. The nickel-in-the-slot machine continued to exist from April 26th to November 11th; and so, too, did the Industrial Workers of the World continue to exist from April 26th to November 11th. Can it be said that the continued existence of the nickel-in-the-slot machine spanned the interval of time between April 26th and November 11th so as to make the two acts of playing the commission of a single offense? We venture the thought that not a single judicial decision reported in the thousands upon thousands of printed books can be found holding that in such instances only one offense has been committed. Suppose that on April 26th the defendant joined a given branch of the I. W. W. in Multnomah County and on November 11th he assem-

103 Or.—31

bled with another branch in Lake County. Could it be contended with any show of reason that an acquittal or conviction in Lake County on an indictment charging the act of assembling would bar a prosecution in Multnomah County on an indictment charging the act of joining? And yet the I. W. W. as an organization has continued without interruption; nor is the supposed case any different from the actual case presented by the record except that in the supposed case both acts did not occur in the same county, while in the actual case both acts did happen in the same county, assuming of course the truth of the indictment. If in the instant case the act of joining in Multnomah County on April 26th and the act of assembling in that county on November 11th are parts of the same transaction, then in the supposed case the act of joining in Multnomah County and the act of assembling in Lake County are parts of one transaction and constitute a single offense; and a conviction or acquittal in one county bars a prosecution in the other county. Chapter 12, Laws of 1919, made it an offense to sell a book teaching sabotage. Suppose that the Industrial Workers of the World printed a prohibited book on April 26, 1919, and on that day Laundy joined the I. W. W. in Multnomah County and subsequently on November 11, 1919, sold one of those books in some other county, could it be said that the act of joining and the act of selling constituted parts of the same transaction? And yet the I. W. W. as an organization has been in existence during the intervening period and the prohibited book has likewise been in existence during the same period. If Laundy had met with a group of persons at a given time and place and all those persons had been organized with Laundy helping, and if at the

same time and place and as a part of the same trans-
action Laundy had been initiated and had assembled
with them, then the act of helping to organize, the act
of becoming a member and the act of assembling
would undoubtedly be parts of the same transaction
and whether taken singly or in combination would
constitute but one offense; but such is not the fact
situation in the instant case. The act of joining and
the act of assembling seven months later were in no
wise connected with each other. Each act was a
separate and distinct transaction and hence a separate
and distinct offense. The defendant was prosecuted
for two crimes in one trial: *State* v. *Hennessy*, 114
Wash. 351 (195 Pac. 211, 213). The law guarantees
to every person the right to be tried for one offense
at a time, no matter what that offense may be and
regardless of whether the offense be some petty
offense against property or a grave offense against
the very government which guarantees that right to
be tried for one offense at a time. When the state
rested its case in chief it had made a record showing
that the defendant was being prosecuted for two
separate and distinct offenses although each was a
violation of the same statute, and the defendant's
motion to require the state to make an election should
have been allowed.

The state caused 59 exhibits to be marked for iden-
tification. Exhibit 42 was admitted as defendant's
exhibit 2–D. Exhibits 51 and 52 were merely marked
for identification, but they were not offered as evi-
dence. Exhibits 58 and 59 were offered by the state
but were rejected by the court. Exhibit 6, a receipt,
was received as evidence for the state and was also
marked as defendant's exhibit 2–N. The remainder
of the 59 exhibits were admitted as evidence for the

state. The defendant claimed that the owner of the hall at 128½ Second Street leased the premises to the Council of Workers, Soldiers and Sailors; that he, the defendant, was the secretary of the Council of Workers, Soldiers and Sailors at a salary of $30 per week and that he was not employed by the Industrial Workers of the World; he testified that the office equipment included, among other things, 250 chairs, desks, paper-rack, and reading-tables; that at his request the Council of Workers, Soldiers and Sailors subleased desk room for two desks to Lumber Workers Industrial Union No. 500 of the I. W. W. and Construction Workers Industrial Union No. 573 of the I. W. W. The defendant explained that his desk was "on the northwest corner * * right by the window in front of the hall," and that the other two desks installed under the sublease were in "the southwest corner directly across the hall from" his desk, and that these two desks were separated from the remainder of the hall by a railing.

The defendant also testified that Fred Myers was the secretary of Construction Workers Industrial Union No. 573 of the I. W. W., and that Myers' desk was the "west one of those two desks." A reading table was maintained in the hall and near the defendant's desk. Papers and books, pamphlets and other printed matter were kept in the hall "by the desk" of the defendant and were available to those who cared to read. The defendant stated that he had been elected chairman of the propaganda committee of the I. W. W. "a couple of times"; and he also stated that the I. W. W. "were given permission to put their book-case outside of the railing, as there wasn't storeroom inside of the railing"; and in answer to a question, "Did you have any of their literature hanging on the wall?" The defendant said:

"Yes." The policemen who interrupted the meeting and took Laundy into custody did so without a warrant of arrest, and they also took from the hall without a search-warrant the larger portion of the exhibits offered by the state and received in evidence. According to the testimony of a witness for the state, policemen remained in the hall for a short time after Laundy was taken to the police station, and the work of gathering up books, pamphlets, printed matter and other things was completed, and then all the things so gathered up were removed to the police station. According to the testimony of the defendant he himself locked the door to the hall; and at the hearing it was claimed in behalf of defendant that the police returned to the hall after Laundy was taken to the police station and removed books, papers and other things from Laundy's desk and from the hall. Thirty-seven of the state's exhibits were taken from the hall at 128½ Second Street on the night of November 11, 1919. Concerning fifteen of these thirty-seven exhibits no testimony was offered, except testimony to the effect that they were found in the hall on the night of the arrest; and consequently we need not now notice this group of fifteen further than to say that they consisted of books of due stamps, books, documents and publications which tended to show that the hall was used as headquarters for the I. W. W., and to say that there was no evidence to indicate that any one of those fifteen exhibits was taken from the inside of any desk or otherwise than from the paper-rack or reading-table. Two of the exhibits found in the hall were "on a desk"; and it is not now necessary to state more concerning them except to state that there was no evidence to show which of the desks they were on. One of the exhibits

received in evidence was merely the imprint of a seal and another was the imprint of a stamp, and so these two exhibits may be eliminated from further notice. Exhibit No. 48 was found hanging on the wall, and it tended to prove that the hall was used as headquarters for the I. W. W. There was no testimony concerning exhibits 56 and 57, which are included among the 37 exhibits taken from the hall, except the testimony of the defendant; and his testimony indicated that these two exhibits were in the open in the hall. Exhibit 1 came "off of one of those desks" (behind the railing). Exhibit 4 was found on Myers' desk. There was no evidence relating to exhibit 33, except an explanation of its use by the I. W. W. and testimony that it was found in the hall. Exhibit 2 which purports to be a lease to the "Council of Workers, Sailors and Soldiers of Portland" was according to one witness "at one of these desks," and according to the testimony of Laundy was in the desk used by him. The remaining thirteen exhibits found in the hall and numbered 5, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, included publications entitled, in the order named thus: The Evidence and Cross-examination of William D. Haywood, Tridon's New Unionism, The General Strike by William D. Haywood, Evolution of Industrial Democracy, Industrial Communism of the I. W. W., The Advance of the Proletariat, Preamble and Constitution of the I. W. W., Industrial Unionism, Perry's Revolutionary I. W. W., The Onward Sweep, I. W. W. Songs (Joe Hill Ed.—15th Ed.), I. W. W. Songs (Gen. Def. Ed.), I. W. W. Songs (15th Ed.). Exhibit 29 was found in Myers' desk but the remainder of these thirteen exhibits were found, in some instances hanging on the wall, and in other instances on tables or out in the

open. The number of copies of the different publica-
tions varied from one to three hundred. A. E. Allen
and William J. Josh gave testimony concerning each
of these thirteen exhibits and James F. Mitchell gave
testimony concerning one of them, exhibit 29. Allen
testified that he joined the I. W. W. at Seattle, Wash-
ington, in the latter part of April, 1919, and continued
to be a member until the latter part of November,
1919; that he was "an organizer and delegate." and
that his duties were to get new members and "to
help spread propaganda, literature." This witness
stated that he was familiar with the literature used
by the I. W. W. and that he handled it in Seattle
"from the time I joined until I quit." Josh joined
the I. W. W. at Tacoma, Washington, on May 30,
1919, and he continued his membership until "the
last of October, or first of November" in 1919. Josh
says that he distributed I. W. W. literature during the
course of his membership. The literature distributed
by Allen and Josh was, according to their testimony
obtained from official representatives of the I. W. W.
in Seattle, Washington. Referring to this group of
thirteen exhibits, Allen testified that copies of each of
them were among copies of I. W. W. literature distrib-
uted by him in Seattle; and, excluding only one of
them Josh stated that he saw copies of them in the
I. W. W. hall in Tacoma and that he disposed of
copies of them there during the course of his member-
ship. Mitchell was a police officer of Spokane, Wash-
ington. He had been brought in touch with the
activities of the I. W. W. in Spokane, was familiar
with I. W. W. literature, and as such officer had
"handled a great deal of it." Mitchell says that an
open I. W. W. hall was maintained in Spokane until
April 4, 1918, or May 4, 1918, at which time "we

closed it out," and since that date "no open hall" has existed. According to this witness the I. W. W. maintained secret headquarters at different places in Spokane from May 4, 1918, until December 29, 1919. Mitchell also testified "we raided" the secret headquarters. Referring to exhibit 29, Mitchell stated that he had seen copies of it in I. W. W. halls in Spokane "prior to April 4, 1918, and up until May 4, 1918; and copies as late as November, 1919." The story of the exhibits has thus far included only the exhibits found in the hall at 128½ Second Street in Portland.

The state offered in evidence copies of certain publications which had been distributed by the authority of the I. W. W. in Spokane, Tacoma, and Seattle, Washington. This group includes exhibits 32, 34, 35, 36, 37, 38, 39, 40, 41, 42, 53 and 54 and are respectively entitled as follows: One Big Union, Pouget's Sabotage, Smith's Sabotage, When the Leaves Come Out, The I. W. W. Its History, Structure and Methods by Vincent St. John, Eleven Blind Leaders, Financial Statement, I. W. W. in the Lumber Industry, Stickers (not found among exhibits), Proletarian & Petit Bourgeoise, Sabotage, and I. W. W. Songs.

According to the testimony of Allen, he distributed in Seattle during the period of his membership copies of most of the publications included in this group of twelve exhibits, and, furthermore, all of the copies so distributed by him were obtained from I. W. W. officers in the I. W. W. hall where the literature was kept. According to the testimony of Josh, he disposed of copies of most of these same exhibits in Tacoma during the period of his membership, and the copies so disposed of by him were likewise obtained from I. W. W. officers at the I. W. W. hall in

Tacoma where the literature was kept. Mitchell testified that in a raid made on secret headquarters in Spokane in August, 1919, he found a number of copies of Smith on Sabotage, exhibit 35, and that he saw copies of "When the Leaves Come Out," exhibit 36, in the I. W. W. hall "up and until April 4, 1918, and May 4, 1918." Referring to I. W. W. songs, exhibit 54, Mitchell stated that he had seized many of them in Spokane on April 4, 1918, and as late as November 4, 1919. Another witness P. F. Keefe, a policeman of Seattle, stated that he had gotten copies of Pouget's Sabotage, exhibit 34, on December 9, 1919, from one of the secret headquarters of the I. W. W. Still another witness, E. T. Gouch, testified concerning two of the exhibits included in this group of twelve. Gouch was United States Immigration Inspector at Astoria, Oregon; he explained that the I. W. W. maintained a hall in Astoria from the fall of 1916 until the middle of September, 1917; that literature was "on sale there at the I. W. W. hall"; that the literature consisted of financial reports and different kinds of booklets and pamphlets and the quantity on hand varied from fifty to one thousand copies; that he bought "two or three pieces in that hall, and then A. E. Soper, the organizer and the head of the I. W. W. brought me two or three copies up to my office at my request and I paid him for them." Gouch identified Pouget's Sabotage, exhibit 34, and Smith's Sabotage, exhibit 35, as copies of the publications purchased by him from Soper. Exhibit 55, a placard, is not with the exhibits accompanying the bill of exceptions. However, there is no evidence in the record relating to this exhibit except the testimony of one witness that he saw it on a wall in an I. W. W. hall in Portland on February 25, 1919. Exhibit 3 is

the defendant's membership book. The remaining exhibit, 43, need not be noticed further.

26. The defendant argued that it was error to receive the testimony of Josh, Allen, Mitchell and Keefe concerning the possession or distribution in the state of Washington of literature attributed to the I. W. W. The indictment charges that the defendant became a member of and voluntarily assembled with the Industrial Workers of the World, and then the indictment proceeds and characterizes the Industrial Workers of the World as a society or assemblage of persons which teaches the doctrines denounced by the statute. The organization, described in the indictment, is one which has its main headquarters in one place with branches in different places throughout the country. If we find a society or organization with its main headquarters centered at a given point with branches scattered throughout the country, and if we find copies of a given publication, attributable to that society as an organization, kept in halls of that society and in secret headquarters maintained in different cities, whether within or without this state, and if we find officers and members of that society disposing of copies in those different cities, then assuredly those facts constitute evidence from which we may infer that such society teaches and advocates the doctrines announced in such publication. All the publications concerning which Allen, Josh, Mitchell and Keefe testified contained matter from which it could be argued that they taught the prohibited doctrines, and, indeed, some of them contained highly inflammatory matter. The court did not err in receiving the testimony of these four witnesses concerning the possession, sale and distribution in the state of Washington of publications attributable to the

I. W. W.: *State* v. *Lowery,* 104 Wash. 523 (177 Pac. 355); *State* v. *Hestings,* 115 Wash. 19 (196 Pac. 13); *State* v. *Hemhelter,* 115 Wash. 208 (196 Pac. 581); *State* v. *Gibson,* 115 Wash. 512 (197 Pac. 611); *State* v. *Payne,* 116 Wash. 640 (200 Pac. 314); *State* v. *Hennessy,* 114 Wash. 351, 195 Pac. 211.

27. The defendant claims that the court erred in admitting evidence of acts done prior to February 3, 1919, the date when the Syndicalism Act became effective. This objection relates particularly to the testimony of Gouch concerning the purchase in 1917 from Soper of the two publications on sabotage, and to the testimony of Mitchell concerning literature seen by him in Spokane in 1918. The testimony of these two witnesses was competent. It was evidence which together with testimony concerning I. W. W. activities after February 3, 1919, could be considered by the jury in determining whether the I. W. W. was or was not at the time specified in the indictment a society that taught the denounced doctrines. The court carefully instructed the jury that this evidence could be considered only in determining what the I. W. W. advocated ''at the time and as charged in the indictment.''

28. The defendant asserts that he cannot be held guilty of the crime of joining the I. W. W. unless he joined in Multnomah County and unless the *situs* of the I. W. W. was localized in that county. The statute makes it an offense to join a society which teaches the prohibited doctrines, and we agree with the statement made by the Supreme Court of Kansas in *State* v. *Berquist,* 109 Kan. 367 (199 Pac. 101),—

''But where a person joins in this state a society of that character he could not escape liability by showing that it had never made Kansas a field of its propaganda.''

See also: *State* v. *Hennessy,* 114 Wash. 351 (195 Pac. 211, 217). If, therefore, the defendant joined the I. W. W. in Multnomah County and at the time of such joining the I. W. W. was a society, which taught the denounced doctrines, then he was guilty of a violation of the syndicalism statute even though the I. W. W. had not localized its *situs* in Oregon.

The defendant complains because of the denial of his petition for the return of his membership book which was taken from him at the police station, and the papers, publications, and things, comprising thirty-seven of the state's exhibits which were taken from the hall. The exhibits, for the return of which the defendant petitioned, may be divided into four classes: (1) Things taken from the defendant's person, and this includes the membership book; (2) things in Laundy's desk and taken from it, and this includes the lease; (3) things in Myers' desk and taken from it; and (4) things in open view in the hall; as, for example, the papers and pamphlets which hung on the wall or were on the reading-table.

The defendant relies upon Article IV of the amendments to the federal Constitution forbidding unreasonable searches and seizures, and upon that part of Article V of the same amendments which protects every person from being compelled to be a witness against himself. The defendant also relies upon Article I, Section 9, of our state Constitution, which, although not in the identical language, is in effect and meaning the same as Article IV of the federal Constitution; and, furthermore, he has invoked the protection of that portion of Article I, section 12, of the state Constitution, which declares that no person shall be compelled in any criminal prosecution to testify against himself.

29. In *Brown* v. *New Jersey,* 175 U. S. 172, (44 L. Ed. 119, 20 Sup. Ct. Rep. 77, see, also, Rose's U. S. Notes), it was held that—

"The first ten amendments to the federal Constitution contain no restrictions on the powers of the state, but were intended to operate solely on the federal government."

See also *Weeks* v. *United States,* 232 U. S. 383 (Ann. Cas. 1915C, 1177, L. R. A. 1915B, 834, 58 L. Ed. 652, 34 Sup. Ct. Rep. 341). The inquiry is, Were the rights of the defendant violated when the policemen removed the thirty-seven exhibits from the hall, and when the membership card was taken from him at the police station? As a preliminary, it is appropriate to say, in the language used by the national Supreme Court in *Weeks* v. *United States*: "This protection" against unreasonable search and seizure guaranteed by our state Constitution "reaches all alike whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all intrusted" with the enforcement of the laws.

30. The Supreme Court of the United States in a series of decisions has made plain the rule of practice to be followed by the federal courts in order to secure to "all alike" the protection intended to be given by the national Constitution. An accused person whose property is taken by an officer of the federal government in violation of the Fourth Amendment is entitled to an order of the court, upon the filing of a timely petition, directing the return of the wrongfully seized property. Ordinarily such a petition must be filed prior to the commencement of the trial, because as a general rule the courts will not, after the trial has begun, suspend the trial of the accused and frame and determine a collateral issue

concerning the means by which an article, competent
as evidence in the trial, was obtained. This court, it
is true, has held in conformity with the rulings of
most of the other courts, including the Supreme
Court of the United States, that the relevancy of a
given article is not affected by the circumstances that
it was wrongfully seized; and hence inquiry will not
ordinarily be made during the trial concerning a col-
lateral issue: *State* v. *McDaniel,* 39 Or. 161, 168 (65
Pac. 520); *State* v. *Wilkins,* 72 Or. 77, 80 (142 Pac.
589); *State* v. *Ware,* 79 Or. 367, 377 (154 Pac. 905,
155 Pac. 364); *Williams* v. *State,* 100 Ga. 511 (28
S. E. 624, 39 L. R. A. 269); *Weeks* v. *United States,*
232 U. S. 383 (Ann. Cas. 1915C, 1177, L. R. A. 1915B,
834, 58 L. Ed. 652, 34 Sup. Ct. Rep. 341); *Burdeau* v.
*McDowell,* 256 U. S. 465 (65 L. Ed. 1048, 41 Sup. Ct.
Rep. 574, 13 A. L. R. 1159); 8 R. C. L. 196. If, however,
the accused does not know until the paper or other
article is offered in evidence that it was obtained by
an unlawful seizure, he is nevertheless entitled at that
time to an order of the court directing a return of the
property: *Weeks* v. *United States,* 232 U. S. 383
(Ann. Cas. 1915C, 1177, L. R. A. 1915B, 834, 58
L. Ed. 652, 34 Sup. Ct. Rep. 341); *Gouled* v. *United
States,* 255 U. S. 298 (65 L. Ed. 647, 41 Sup. Ct. Rep.
261); *Amos* v. *United States,* 255 U. S. 313 (65
L. Ed. 654, 41 Sup. Ct. Rep. 266). This rule of prac-
tice sanctioned by the Supreme Court of the United
States ought, for the same reasons which recommended
it to the court, be adopted and followed by the courts
of this state. In the instant case the defendant filed
a timely petition, and therefore if his constitutional
rights were violated his petition ought to have been
allowed. The question to be answered then is, Was
the right granted by Article I, Section 9, of our state

Constitution violated? If the membership book and all of the thirty-seven exhibits were taken lawfully, or if they were taken without violating any of Laundy's rights, he cannot complain.

31. The policemen who entered the hall and arrested Laundy did so without a warrant of arrest and without a search-warrant; and, therefore, if their conduct in taking the membership book and the thirty-seven exhibits removed from the hall was lawful, it was so only because the arrest was lawful. The Code, Section 1745, declares that "a peace officer is * * a * * marshal, or policeman of a town." The policemen who arrested Laundy were therefore peace officers. Section 1754, Or. L., provides:

"An arrest may be either,—(1) By a peace officer, under a warrant; (2) By a peace officer, without a warrant."

Section 1763, Or. L., states:

"A peace officer may, without a warrant, arrest a person,—(1) For a crime committed or attempted in his presence; (2) When the person arrested has committed a felony, although not in his presence; (3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

Section 3 of Chapter 12, Laws of 1919, declares that a person who does any of the acts prohibited by that section "is guilty of a felony." The arrest was therefore made lawfully, and consequently the policemen had a right to do whatever they could have done if they had held a warrant of arrest: *Smith* v. *State*, 3 Ga. App. 326 (59 S. E. 934); *Jenkins* v. *State* 4 Ga. App. 859 (62 S. E. 574). See also *State* v. *Hassan*, 149 Iowa, 518, 524 (128 N. W. 960).

32. An arresting officer who makes a lawful arrest may search his prisoner, and in the language of Bishop,

"if he finds on the prisoner's person, or otherwise in his possession, either goods or money which he reasonably believes to be connected with the supposed crime, as its fruits, or as the instruments with which it was committed, or as supplying proofs relating to the transaction, he may take and hold them to be disposed of as the court directs." 1 Bishop's New Criminal Procedure, § 211.

If the arrest of a prisoner is lawful, a search of the person of the prisoner is lawful; and the officer making such lawful arrest and lawful search may take from the prisoner not only instruments of the crime but also such articles as may be of use as evidence on the trial: *Weeks* v. *United States,* 232 U. S. 383 (Ann. Cas. 1915C, 1177, L. R. A. 1915B, 834, 58 L. Ed. 652, 34 Sup. Ct. Rep. 341); *State* v. *Edwards,* 51 W. Va. 220 (41 S. E. 429, 59 L. R. A. 465); 1 Wharton's Criminal Procedure (10 ed.), § 97 et seq.; 2 R. C. L. 469; 5 C. J. 434; 35 Cyc. 1271. The search is justifiable as an incident to the lawful arrest: 2 R. C. L. 197; 5 C. J. 434. The taking of the membership book was lawful.

33. The right of the arresting officer to seize articles of evidentiary value is not confined to the right to search and take property from the person of a prisoner. Stated broadly, the general rule is that the arresting officer may at the time of making the arrest lawfully take articles in the possession or under the control of the prisoner, if they supply evidence of guilt: *Azparren* v. *Ferrel,* 44 Nev. —— (191 Pac. 571, 11 A. L. R. 678); *Holker* v. *Hennessy,* 141 Mo. 527 (42 S. W. 1090, 64 Am. St. Rep. 524, 39 L. R. A. 165); *Getchell* v. *Page,* 103 Me. 387 (69

Atl. 624, 125 Am. St. Rep. 307, 18 L. R. A. (N. S.)
253); *Gamble* v. *Keyes,* 35 S. D. 644 (153 N. W. 888).
Articles appearing in open view, the discovery of
which requires no search, may be taken if of eviden-
tiary value: *State* v. *Quinn,* 111 S. C. 174 (97 S. E. 62,
3 A. L. R. 1500); *State* v. *Mausert,* 88 N. J. L. 286 (95
Atl. 991, L. R. A. 1916C, 1014); *Newman* v. *People,*
23 Colo. 300 (47 Pac. 278). Indeed, the arresting
officer may in some circumstances search the room or
place where the accused is arrested: *Smith* v. *Jerome,*
47 Misc. Rep. 22 (93 N. Y. Supp. 202); *People* v.
*Cona,* 180 Mich. 641 (147 N, W. 525); *Getchell* v.
*Page,* 103 Me. 387 (69 Atl. 624, 125 Am. St. Rep. 307,
18 L. R. A. (N. S.) 253); *State* v. *Robbins,* 124 Ind.
308 (24 N. E. 978, 8 L. R. A. 438).

34. It must be borne in mind that the instant case
is not one where the arrest was made in the home of
the defendant or in his private office; and hence we
need not and do not attempt to ascertain the limits
of the right to search in the home or private place
of the prisoner, nor need we attempt to ascertain the
limits of the right of the arresting officer to search
any other kind of a room or building in which the ar-
rest is made, although stated in general language the
rule seems to be that an arresting officer may, if
making a lawful arrest, at the time of the arrest
search the room or place where the accused is ar-
rested. If the thirty-seven exhibits were gathered
up at the time of the arrest and as a part of that
transaction, the situation is entirely different from
one where entry, search and seizure were begun and
made in the private home of the accused after his
arrest in such home and removal therefrom; and so
too, the instant case is quite different from one where
the accused is arrested in a place other than his

home or place of business, and his home or place of business is searched contemporaneously with or after his arrest: See *Weeks* v. *United States*, 232 U. S. 383 (Ann. Cas. 1915C, 1177, L. R. A. 1915B, 834, 58 L. Ed. 652, 34 Sup. Ct. Rep. 341); *Silverthorn Lumber Co.* v. *United States*, 251 U. S. 385 (64 L. Ed. 319, 40 Sup. Ct. Rep. 182); *Gamble* v. *Keyes*, 35 S. D. 644 (153 N. W. 888). Furthermore, the instant case is not one where a search and seizure are made without a warrant and then subsequently a warrant of arrest is issued and an arrest made: See *State* v. *Marxhausen*, 204 Mich. 559 (171 N. W. 557, 3 A. L. R. 1505). Regardless of the character of the hall, whether it was public or a *quasi*-public or private place, the seizure of all of the articles which were in open view was lawful.

35. If any articles were unlawfully taken from Myers' desk, the defendant cannot complain for the reason that if the right of any person was violated it was that of Myers or that of some other third person, and not that of the defendant.

36. We have thus far disposed of all of the thirty-seven exhibits except the lease which was taken from Laundy's desk. This paper was not the private paper of Laundy's. The lease was, according to Laundy's own testimony, the property of the Council of Workers, Soldiers and Sailors; and the only inference to be drawn from the record is that the desk in which the paper was kept was not the private property of Laundy's, nor was the desk used for his own private purposes. The hall was at least a *quasi*-public place. The hall was not the home of Laundy, or his private place of business. It is not necessary to decide whether or not there is such a degree of intimacy between Sections 9 and 12 of Article I of our state Constitution as to make of them a unity in

the sense attributed by the Supreme Court of the United States to the Fourth and Fifth Amendments to the federal Constitution: See 3 Wigmore on Evidence, § 2264. It is our conclusion that no constitutional right of the defendant was violated by the taking of any of the state's exhibits, even though it be assumed that the constitutional right of some other person or persons was violated. Moreover, the defendant himself testified as a witness in his own behalf about the lease; and this testimony formed a substantive part of his defense against the charge in the indictment, rather than against any inferences that might have been drawn from the introduction of the lease.

37. The defendant insists that intent and knowledge are essential elements; and he therefore assails the indictment because: (a) It does not aver that he knew that the Industrial Workers of the World taught the prohibited doctrines; and (b) it does not allege that he intended to aid in the dissemination of the unlawful doctrines. The defendant complains because the court refused to give certain instructions requested by the defendant concerning intent and knowledge. The legislature may as a general rule penalize the doing of an act without regard to the intent or knowledge of the doer; and yet this legislative power is not without constitutional limitations, for as expressed by Mr. Chief Justice RUDKIN in *State v. Strasberg,* 60 Wash. 106 (110 Pac. 1020, Ann. Cas. 1912B, 925, 32 L. R. A. (N. S.) 1216), "we can scarcely conceive of a valid penal law which would punish a man for the commission of an act which the utmost care and circumspection on his part would not enable him to avoid."

38. The circumstance that the word "knowingly," or its equivalent, does not appear in a statute is not conclusive; but the question whether words expressing criminal intent or guilty knowledge are to be implied is a matter of construction to be determined by considering the subject matter of the statute, the language of the act, the evil sought to be eradicated or prevented, and the consequences of the several constructions to which the statute may be susceptible. If the language and subject matter of the statute show clearly that it was the manifest intention of the legislature to make the doing of an act a crime, regardless of the knowledge or intent of the doer, the courts will give effect to the intention of the legislature even though the statute may seem to operate harshly in a given instance; but as stated in *People* v. *Rice,* 161 Mich. 657 (126 N. W. 981), courts are "slow to find a legislative intention to condemn a man for not knowing that which he cannot know."

39. We are now examining only a portion of the syndicalism statute. No word appearing in the statute qualifies "organizes" or "helps to organize" or "become a member of ," and the only word which qualifies "assemble" is the word "voluntarily." Moreover, it is significant that the words "with the intent," although not connected with the portion of the statute now under examination, are found connected with the immediately preceding clause. The statute neither expressly nor impliedly makes guilty knowledge or criminal intent essential elements of the crime: *State* v. *Hennessy,* 114 Wash. 351 (195 Pac. 211); *People* v. *Malley* (Cal. App.), 194 Pac. 54. As said by Mr. Justice FIELD in *United States* v. *Kirby,* 7 Wall. 482 (19 L. Ed. 278),—

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law, in such cases, should prevail over its letter."

40. The court instructed the jury

"to voluntarily assemble within the meaning of the statute means to meet with and take part in the proceedings of an assemblage of persons with the purpose of aiding and abetting in carrying out the common design of said meeting."

The defendant was not entitled to an instruction more favorable than the one given by the court.

41. The court also instructed the jury:

"Relative to the question as to whether or not the defendant, at the time he is alleged to have become a member of this organization had knowledge of its alleged unlawful character or purposes as charged in the indictment, the court instructs you that before you can find against the defendant on this phase of the case by reason of his alleged membership in said organization, you must be satisfied from the evidence beyond a reasonable doubt that at the time of becoming a member in said organization, as charged herein, if you find that he did so become a member, he knew or had reasonable grounds of believing, or had a reasonable opportunity to learn, of the alleged unlawful purposes or character of said organization."

The defendant was not entitled to more than was given him by the last quoted instruction; for by that instruction the court prevented the jury from adjudging the defendant guilty of that which he could not know: *State* v. *Cox,* 91 Or. 518 (179 Pac. 575).

The court properly refused to give defendant's seventh and tenth requested instructions. The trial

court likewise properly refused to direct a verdict
of not guilty.

The syndicalism statute is a constitutional and
valid law, and therefore any person who violates it
commits a crime and is punishable. If the defendant
violated the syndicalism statute in either of the par-
ticulars alleged in the indictment he committed a
crime for which he can be punished. The indictment
is sufficient and complies with all of the require-
ments of the law. The court did not receive incompe-
tent evidence concerning the character of the I. W.
W., nor concerning the act of joining the I. W. W.,
nor concerning the alleged act of assembling. The
indictment alleges that at one time and at one place
the defendant joined and assembled with the I. W. W.
But the evidence relied upon by the state tended to
show that the defendant joined the I. W. W. on
April 26, 1919, and that on the following eleventh
day of November he assembled with persons be-
longing to the I. W. W. The indictment charged one
crime. But the defendant was tried for two crimes;
one, the crime of joining on April 26th and, the other,
the act of assembling on November 11th. The de-
fendant was tried for two crimes on an indictment
which charged only one crime. The law gave to the
defendant the right to be tried for one crime at a time.
He insisted upon that right; he was denied that right;
and because of such denial the judgment must be
reversed and a new trial granted.        REVERSED.

BURNETT, C. J., and McCOURT, J., not sitting.

BEAN, J., dissents.

———

Denied April, 11, 1922.

ON PETITION FOR REHEARING.

(206 Pac. 290.)

REHEARING DENIED.

*Mr. Walter H. Evans,* District Attorney, *Mr. W. H. Hallam,* Deputy District Attorney, and *Mr. E. F. Bernard,* Deputy District Attorney, for the petition.

*Mr. George F. Vandeveer* and *Mr. H. M. Esterly, contra.*

HARRIS, J.—The plaintiff has petitioned for a rehearing. The judgment was reversed upon the ground that the defendant was tried for two separate crimes upon an indictment charging only one crime. All of the members of the court who concurred in the original opinion still adhere to that opinion, while Mr. Justice BEAN adheres to his dissent; and, consequently, nothing more need be said concerning any of the points discussed in the original opinion, for the views of a majority of the court were there expressed at length.

The petitioner discusses only one point not noticed in the original opinion, and hence attention will be given to that one point only. It is contended that the defendant did not except to the ruling of the court denying the motion to require the plaintiff to elect, and, in support of this contention, the plaintiff directs our attention to page 429 of the bill of exceptions where we read as follows:

"Portland, Oregon, Tuesday, March 30, 1920.
        "9:30 o'clock A. M.

"Mr. Vandeveer: Your Honor, I wish the record to show at this time we renew our motion to require the state to elect upon which charge they rely.

"The Court: The motion will be denied."

The recital just quoted was not everlooked when the original opinion was written. The printed brief filed in behalf of the plaintiff exhaustively and learnedly discusses many legal questions, and, indeed, the brief may be appropriately described as a legal treatise on some of the questions discussed. Although much space is given in the printed brief to most of the questions, including the question of duplicity, only a single paragraph is devoted to the contention now under investigation, and yet that single paragraph was amply sufficient to attract attention to the record. Upon examining the record we discovered that the quoted recital did not stand alone, but that upon the contrary the question had been previously presented to the trial court, and that upon each prior occasion an exception was saved to the ruling of the court denying the motion; and so, after having first examined the record, we were then of the opinion just as we are now of the opinion, that the defendant had not waived his right on appeal to review the ruling of the trial court denying the motion to require the plaintiff to elect.

42. Before noticing the record, let us first consider the subject of exceptions. What is an exception? What is its office and function? Is it nothing more than an arbitrarily prescribed ceremonial amounting to a meaningless mummery; or, is it, like most rules of procedure, a rule based, not upon purely arbitrary grounds, but upon substantial reasons and hence designed to accomplish in a logical and under-

standable way a definite purpose? In the language of the Code, ''an exception is an objection taken at the trial to a decision upon matter of law'': Section 169, Or. L. An exception is a protest against a ruling of the court. It is notice to the court and opposing counsel that the objector does not acquiesce in the ruling. When, for example, in the course of a trial an objection is made to a question asked a witness, and the court rules on the objection, the objector may or he may not be satisfied with the ruling. If the objector is satisfied with the ruling, the court and the opposing attorney are entitled to know it; and so, too, they are entitled to know it, if the objector is not satisfied. If the objector is silent after the court announces its ruling, the presumption is that the objector, after hearing the ruling and the reasons for it, acknowledges the correctness of the ruling and acquiesces in it; and, consequently, in order to prevent the presumption of acquiescence the objector must ordinarily express his nonacquiescence: Section 169, Or. L.; *Hayes* v. *Clifford,* 42 Or. 568 (72 Pac. 1); *Fornof* v. *Wilkinsburg Borough,* 238 Pa. St. 614 (86 Atl. 494); 3 C. J. 894; 8 Ency. Pl. & Pr. 157; 2 R. C. L. 92.

No particular form is required for expressing an exception, although the usual form is to say: ''I except,'' or ''I save an exception,'' or ''exception,'' or the like. Since one of the reasons for an exception is to give notice that the objector does not acquiesce in the ruling, any language which gives notice that the objector protests against the ruling and does not acquiesce in it, ought to be sufficient: *Hayes* v. *Clifford,* 42 Or. 568 (72 Pac. 1); 2 R. C. L. 94. In passing, it is not out of place to direct attention to cases where it has been held that the nonacquiescence

of an objector may sufficiently appear even though he does not in express terms say "I except"; as, for example, in *Woolsey* v. *Lasher,* 35 App. Div. 108 (54 N. Y. Supp. 737), it was held that although the appellant did not use the words "I except," he indicated his intention not to acquiesce in the ruling but to review the same, the right to review was not lost merely because the plaintiff failed to use the technical phrase "I except" to the ruling of the court. Another illustration is found in *Newton* v. *City of Worcester,* 169 Mass. 516 (48 N. E. 274), where it appeared that it was understood by the court and the parties that the defendant wished to have the construction of a particular statute determined by the supreme judicial court in case the ruling of the presiding judge should be adverse to the contention of the defendant, and it was there held that an exception to the ruling should be allowed even though no statement was made in express terms that an exception was taken. Other precedents in point are the following: *Snelling* v. *Yetter,* 25 App. Div. 590 (49 N. Y. Supp. 917); *Deane* v. *City of Buffalo,* 42 App. Div. 205 (58 N. Y. Supp. 810).

In addition to serving as notice of nonacquiescence, an exception, in many jurisdictions, performs another function, although it is possible that this other function is not now so important in this jurisdiction as it was before the amendment of certain sections of the Code regulating appeals. Stated broadly an appeal in an action at law, as well as an appeal in a criminal action, presents to the Supreme Court nothing but the judgment-roll, or a part of it. Upon an appeal in a criminal action just as upon an appeal in a civil action the judgment or order appealed from can only be reviewed as to questions of law appearing upon

the transcript: Sections 556 and 1625, Or. L.   Origi-.
nally the record submitted to the appellate court was
a certified copy of the judgment-roll, and hence the
use of the word "transcript" in Sections 556 and 1625
(see *Turner* v. *Hendryx,* 86 Or. 590, 600 (167 Pac. 1019,
169 Pac. 109); Section 1621, Or. L.); but latterly,
by force of an amendment (Chapter 335, L. 1913,
codified as Section 554—1), the original pleadings
and the original bill of exceptions are required to be
sent by the clerk of the trial court to the clerk of the
Supreme Court, and, when delivered to the latter
clerk, such original pleadings and original bill of
exceptions "shall be a part of the transcript."
Originally the bill of exceptions was presented in a
short or skeleton form, except of course in cases
where the appeal involved a ruling denying a motion
for a directed verdict or denying a motion for a
nonsuit, in either of which events a bill of exceptions
usually included all of the testimony.   However,
latterly by force of an amendment,

"the bill of exceptions may consist of a transcript
of the whole testimony and all of the proceedings
had at the trial * * ."   Chapter 332, L. 1913, amend-
ing Section 171, Or. L., *Malloy* v. *Marshall-Wells Hard-
ware Co.,* 90 Or. 303, 318 (173 Pac. 267, 175 Pac.
659, 176 Pac. 589).

Stated in general terms, it may be said that upon
an appeal from a judgment rendered either in a civil
or criminal action the judgment-roll is the record
which is presented to the appellate court.   The Code
commands the clerk to prepare a judgment-roll when
a civil or criminal action terminates in a judgment.
Among the documents to be included in a judgment-roll
is a bill of exceptions, if there be one: Sections 208
and 1582, Or. L.   Most of the rulings made during the

course of the trial of a civil or criminal action are such as cannot become a part of the judgment-roll, unless they are incorporated in a bill of exceptions; and, consequently, the only means offered for presenting such rulings to the appellate court is a bill of exceptions. As previously stated, under the original practice which required a bill of exceptions to be in a short or skeleton form the office of an exception was in one respect possibly more important than under the present practice which permits a bill of exceptions in an unabridged form. Under the original practice an exception was necessary to produce a bill of exceptions, and hence such a bill was liberally what the name signifies, a bill of exceptions: *Gregg* v. *Groesbeck,* 11 Utah, 310 (40 Pac. 202, 32 L. R. A. 266); *Goldberg* v. *Sisseton Loan & Title Co.,* 24 S. D. 49 (123 N. W. 266, 140 Am. St. Rep. 775); *Jones* v. *Broadway Roller Rink Co.,* 136 Wis. 595 (118 N. W. 170, 19 L. R. A. (N. S.) 907); *Territory* v. *Caffrey,* 8 Okl. 193 (57 Pac. 204); *Goodwin* v. *Bickford,* 20 Okl. 91 (93 Pac. 548, 129 Am. St. Rep. 729). Under the present practice an extension of all the shorthand notes, made by the court reporter and properly authenticated by the trial judge, may be filed as a bill of exceptions, and when so filed is presented as a part of the judgment-roll. The original importance of one of the two functions of an exception was recognized by Section 172, Or. L., where it was and still is provided:

"No exception need be taken or allowed to any decision upon a matter of law, when the same is entered in the journal, or made wholly upon matters in writing and on file in the court";

because in the enumerated cases an exception was not necessary for the reason that such "decision"

became a part of the judgment-roll even though no bill of exceptions was prepared.

In the instant case the bill of exceptions consists "of a transcript of the whole testimony and all of the proceedings had at the trial," and this bill of exceptions is a part of the "transcript" within the meaning which must now be given to the word "transcript" in Sections 556 and 1625, Or. L.

What can the appellate court review? If the appeal be from a judgment in an action at law, Section 556, Or. L., answers the question by declaring that the Supreme Court can review only "questions of law appearing upon the transcript." If the appeal be from a judgment in a criminal action, Section 1625, Or. L., gives the same answer by stating that the Supreme Court can review only "questions of law appearing upon the transcript." This is the only statutory declaration upon the subject; it is the only prohibition imposed by the statute; and if there be any additional prohibitions or restrictions they are only such as are prescribed by judicial decisions. In this jurisdiction, as in most jurisdictions, the general rule established by court decisions is that only such questions of law as are presented upon an objection, an adverse ruling, and an exception will be reviewed upon an appeal: *State* v. *Megorden,* 49 Or. 259, 269 (88 Pac. 306, 14 Ann. Cas. 130); *Morgan* v. *Johns,* 84 Or. 557 (165 Pac. 369); *Bagley Co.* v. *International Harvester Co.,* 99 Or. 519 (195 Pac. 348); but this rule, like many rules, has its exceptions. One exception to this general rule, expressly recognized by the Code, is found where the question of law is one that is involved in a ruling which properly appears in the judgment-roll even though there be no bill of exceptions. In the absence

of an express statute prohibiting it, courts have at times in the furtherance of justice considered errors of law appearing upon the record, notwithstanding the absence of an exception, although such instances are not of frequent occurrence. The discussion thus far is designed merely to call attention to the office and function of an exception, so that added emphasis may be given to the statement that the rule requiring an exception to a decision of the court is founded upon a reason, and so that it may be made to appear that it is sometimes possible to satisfy the reason of the rule without in express terms saying: "I except." Rule 12 provides as follows:

"The court reserves the right in furtherance of justice to notice on its own initiative a plain error of law apparent on the face of the record." 100 Or. 750 (173 Pac. x).

43. It is not necessary, however, in the instant case and therefore we neither decide nor intimate whether this court could, in the absence of an exception written in the record, or would if it could, consider a question of law appearing upon the transcript, because the record presented here plainly shows that the defendant protested against the denial of the motion to require the plaintiff to elect and never at any time impliedly or otherwise acquiesced in the ruling of the court.

The recital appearing on page 429 of the bill of exceptions and upon which the plaintiff relies cannot be understood unless some of the occurrences preceding it are related. The defendant demurred to the indictment on the ground of duplicity. The court overruled the demurrer and we approved that ruling. When the cause was called for trial the defendant moved that the plaintiff be required to return the

documents seized by the police. After the court ruled upon that motion, the attorney for the defendant addressed the court in part as follows:

"Now before the trial of this case starts, your Honor, I want to move for an order requiring the district attorney to elect upon which of the various charges contained in this indictment he will proceed to trial. We have raised the question of duplicity by demurrer, which was overruled and an exception allowed, but it is common practice to present the matter in this way and I feel that our petition should be granted. They have charged here that the defendant became a member of a certain organization. That is a definite act constituting a definite violation of Section 3 of the statute. They have charged again that he did assemble with certain people, not alleging that he was then a member. That is an offense which a man whether he was a member or not could commit. But there is a certain other definite act charged against him constituting another definite violation of the law if proved, they have charged a third one in this indictment as I recall it,— 'That he did help to organize.' Now there is a third act,—Help to organize the I. W. W. Which of these things are we here to answer? Now we object to being shot at as in police court with a sawed-off shotgun on the theory that something may hit us. The statute of this state says that a man may be proceeded against on one charge at a time and we want to know what the charge is that we are here to answer and not be compelled to answer all three at once."

After the matter had been argued "at considerable length" the court ruled as follows:

"I don't think the state is compelled to elect. If the question was raised on demurrer if your position was right the court should have passed on that. The motion to elect will be denied."

The attorney for the defendant said "an exception"; and the court replied, "an exception is

allowed." The trial proceeded until the plaintiff rested its case in chief, and upon reaching that stage of the trial the attorney for the defendant stated to the court:

"There are three charges contained in this indictment, and in event my motion for a directed verdict is denied, I will want to renew my motion and require the state to elect upon which of these it will go to the jury."

Upon being informed that the argument would consume "the afternoon" the court excused the jury "until to-morrow morning at 9:30." The matter was argued "at length" by the attorneys. The judge expressed his opinion at some length and concluded with the statement:

"I think that phase of the indictment [help to organize] should be eliminated from the consideration of the jury, but on the two questions of membership and voluntarily assemble with an organization it should go to the jury."

There was further argument. The court denied the motion for a directed verdict. The attorney for the defendant requested the allowance and the court allowed an exception. Thereupon court adjourned.

In substance the record plainly shows that the attorney for the defendant in effect said to the court:

"We object to the submission of any questions at all to the jury; but if the court decides to submit the case to the jury we insist that only one question, to be selected by the plaintiff, be submitted."

44. The whole matter was thrashed out by extended arguments made in the absence of the jury. The court made a ruling which was at once a denial of the motion for a directed verdict and a second denial of the motion to require the plaintiff to elect; and it is

plain that the defendant protested against that ruling. A protest against a single ruling which denies two motions may be treated as a protest as to each motion: *Sotham* v. *Drovers' Tel. Co.,* 239 Mo. 606 (144 S. W. 428); *Mugan* v. *Wheeler,* 241 Mo. 376 (145 S. W. 462).

When court convened the following day, the defendant again and for the second time renewed his motion to require the plaintiff to elect, as explained by the recital quoted from page 429 of the bill of exceptions. Although it may be that the motion was renewed for the second time out of an excess of caution, nevertheless it was not necessary to do so, for the defendant had on the previous day made a record sufficient to present the question on appeal. Moreover, the very language attributed to the attorney for the defendant on page 429 of the bill of exceptions carries with it an assumption upon the part of the attorney for the defendant that the court would deny the motion and at the same time the language carries with it the implication of non-acquiescence in the anticipated ruling. The petition for a rehearing is denied.        REHEARING DENIED.

BURNETT, C. J., and McCOURT, J., took no part in this decision.